UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ADIDAS AMERICA, INC. and ADIDAS-
SOLOMON AG,

CV 01-1655-KI

REDACTED OPINION AND
ORDER

                    Plaintiffs,

        v.

PAYLESS SHOESOURCE, INC.,

                    Defendant.
_____

KING, Judge:

        adidas-America, Inc. and adidas-Solomon AG (collectively, "adidas") filed this action

against Payless Shoesource, Inc. ("Payless") for trademark and trade dress infringement, dilution,

and related federal and state law claims.  adidas alleges Payless is willfully infringing adidas'

trademark rights by marketing and selling footwear bearing confusingly similar imitations of

adidas' Three-Stripe trademark and Superstar Trade Dress.

PAGE 1 - REDACTED OPINION AND ORDER

Before the court are (1) adidas' motion for partial summary judgment (doc. 539); (2) Payless' motion to strike plaintiffs' demand for jury trial (doc. 545); (3) Payless' motion for summary judgment on adidas' claim of willfulness (doc. 547); (4) Payless' motion for summary judgment dismissing adidas' federal and state dilution claims (doc. 548); (5) Payless' motion for summary judgment on adidas' claim of trademark and trade dress infringement (doc. 550); (6) Payless' motion for summary judgment on affirmative defense of laches (doc. 551); and (7) Payless' motion (doc. 651) to strike the Rule 26 reports of Dr. Gerald Ford.

For the reasons set forth below, adidas' Motion for Partial Summary Judgment (doc. 539) is GRANTED in part, and DENIED in part; Payless' Motion to Strike adidas' Demand for Jury Trial (doc. 545) is DENIED; Payless' Motion for Summary Judgment on adidas' Claims of Willfulness (doc. 547) is DENIED; Payless' Motion for Summary Judgment on adidas' Federal and State Dilution Claims (doc. 548) is GRANTED in part, and DENIED in part; Payless' Motion for Summary Judgment on adidas' Trademark and Trade Dress Infringement Claims (doc. 550) is DENIED; and Payless' Motion for Summary Judgment on the Affirmative Defense of Laches (doc. 551) is DENIED; and Payless' Motion (doc. 651) to Strike Dr. Gerald Ford's Rule 26 Reports is DENIED.

## I. Background

The following relevant facts are taken from the parties' respective concise statements of material fact and are undisputed.

## A. The Parties and Their Products

adidas manufactures and sells athletic and casual footwear.  As early as 1952, adidas began placing three parallel bands on athletic shoes, and in 1994, adidas registered the first of

PAGE 2 - REDACTED OPINION AND ORDER

several variations of Three-Stripe trademark with the U.S. Patent and Trademark Office.  The 1994 Three-Stripe mark consists of three parallel and equidistant double-serrated stripes of contrasting color on the side of the shoe running diagonally from the mid-sole forward to the shoelaces.  In 1999, adidas registered a slight variation of the Three-Stripe mark, which consists of three parallel and equidistant straight-edged stripes of contrasting color running diagonally from the mid-sole forward to the laces on the side of the shoe.[1]

Among its many different models of shoes, adidas manufactures and sells the Superstar, Country Ripple, Tuscany/adi Racer, Pranja, Copa Mundial, Campus, Samoa, Stan Smith Millennium, and Mei, which are all at issue in this case.  Each of the shoes at issue here bear variations of the registered Three-Stripe mark.  Some bear three double-serrated stripes, others bear three straight-edged stripes.  For the purpose of its trademark claims, adidas does not claim protectable rights in any shoe feature other than its Three-Stripe Mark.

adidas has used and promoted the Three-Stripe Mark since 1952, and promotes itself as "The Brand With Three Stripes."  adidas has used the mark in connection with its frequent sponsorship of professional sports events and organizations, such as the World Cup soccer tournament, the Boston Marathon, the New York Yankees, University of Notre Dame, the University of California at Los Angeles, the University of Nebraska, and the University of Tennessee.  adidas also sponsors numerous professional athletes who wear apparel bearing the Three-Stripe mark.  Since introducing the Three-Stripe mark, adidas has spent millions of dollars

---

[1]Between 1994 and 2005, adidas registered at least five separate Three-Stripe trademarks covering various models of "athletic footwear." Though adidas' various trademark registrations are not all identical, each registration bears three parallel, equidistant and diagonal stripes from the sole of the shoe to the laces.  For the purposes of this opinion, the term "Three-Stripe Mark" encompasses all of adidas' registered variations of the Three-Stripe Mark for "athletic footwear."

promoting the mark and products bearing the mark.  In recent years, adidas' annual sales of products bearing the Three-Stripe mark have totaled in the billions of dollars globally, and in the hundreds of millions of dollars within the United States.

adidas also claims protected rights in a Superstar Trade Dress.  adidas first introduced the Superstar Trade Dress in 1969 and its principle features have not changed since that time.  It consists of: (1) three parallel stripes (*i.e.*, the Three-Stripe Mark) on the side of the shoe parallel to equidistant small holes; (2) a rubber "shell toe"; (3) a particularly flat sole; and (4) a colored portion on the outer back heel that identifies the shoes as adidas' brand.

adidas has used and promoted the Superstar Trade Dress since its introduction in 1969. The general public, professional and amateur athletes, hip-hop music artists, and the media commonly associate the Superstar Trade Dress with adidas.  The Superstar was widely used by professional basketball players in the 1970s.  In the late 1980s, the adidas "shell toe" reemerged as a fashion shoe, made popular by hip-hop music artists such as the Beastie Boys and Run-DMC.  Since 1999, sales of Superstar shoes have exceeded $711 million, with more than 5 million pair sold in the United States in 2001.

adidas has enforced its rights in both the Three-Stripe mark and the Superstar Trade Dress.  Since 1995, adidas has pursued over 325 infringement matters involving the Three-Stripe mark in the United States, filed more than 35 separate lawsuits for infringement of the Three-Stripe mark, and entered into more than 45 settlement agreements with companies selling infringing footwear.

Payless is one of the nations' largest retailers of discount casual and athletic footwear. Payless operates approximately 4,500 stores in 49 states, and sells more than 200 million pairs of

PAGE 4 - REDACTED OPINION AND ORDER

shoes annually.  Since at least 1994, Payless has marketed and sold athletic shoes bearing

parallel stripes.[2]  Though Payless no longer sells footwear bearing three parallel stripes, Payless

does sell several models of athletic footwear that bear two or four parallel straight-edged stripes,

running diagonally from the mid-sole forward to the laces.  Payless does uses stripe designs on

shoes not to signify source, but as mere decoration or ornamentation.

Payless also sells shoes that have a rubber "shell toe," a flat sole, and a colored portion on

the outer back heel.  Instead of using three stripes, however, Payless' "shell toe" shoe bears four

parallel straight-edge stripes on the side of the shoe, parallel to equidistant small holes.  Payless

acknowledges that it uses adidas' shoes as "inspirations" for its stripe-shoe designs.

None of Payless' allegedly infringing shoes bear three stripes.  Rather, they all bear either

two or four parallel stripes running diagonally from the mid-sole to the laces.  Payless shoes are

sold almost exclusively at Payless retail stores, and adidas shoes are not available at Payless

retail stores. Although the parties dispute whether they compete for the same consumers, adidas

and Payless do advertise their respective products through at least some of the same media

channels.

---

[2] The parties dispute how long Payless has been selling shoes with stripe designs like the
allegedly infringing shoes at issue.  The parties dispute whether the striped shoes Payless sold in
the 1970s, 1980s, and 1990s were sufficiently similar to adidas' trademark, so as to put adidas on
notice of Payless' potentially infringing conduct.  The parties also dispute the number of pairs of
striped shoes sold by Payless during the 1990s, and whether those sales were significant enough
to put adidas on notice of Payless' conduct. Payless maintains that it has been continuously and
openly advertising shoes with two and four parallel stripes since at least 1973, and throughout
the 1970s, 1980s, and 1990s.  adidas contends that Payless did not start selling the allegedly
infringing shoes at issue until October 2001, approximately one month prior to adidas' initiation
of the present lawsuit.

PAGE 5 - REDACTED OPINION AND ORDER

## B. History of the Dispute

In 1994, adidas filed an action alleging Payless willfully infringed adidas' trademark rights by selling athletic shoes bearing confusingly similar imitations of adidas' Three-Stripe mark.[3]  Pursuant to a subsequent 1994 Settlement Agreement, Payless agreed not to sell athletic shoes bearing "three substantially straight parallel stripes on the side of the shoe running diagonally from the outsole forward to the lacing area," or "two or four parallel double-serrated stripes of contrasting color running diagonally from the outsole forward to the lacing area." adidas, in turn, agreed to dismiss the action with prejudice, and to release any claims that it "brought or could have brought" based on Payless' use of "two or four parallel double-serrated stripes" on footwear.  Payless thereafter ceased selling three-striped shoes, as well as shoes with two or four double-serrated stripes, but continued to sell shoes with two or four straight-edged stripes.

In November 2001, adidas filed this action, claiming Payless violated the 1994 Settlement Agreement, and alleging some of Payless' two- and four-stripe shoe designs infringed adidas' Three-Stripe mark and Superstar Trade Dress.  Payless moved for summary judgment on all of adidas's trademark claims, arguing that the claims were barred by the parties' 1994 Settlement Agreement because the 1994 Settlement Agreement only prohibited Payless from selling shoes with serrated stripes and the shoes at issue had straight-edged stripes.  adidas contended Payless' shoes violated the agreement because the shoes were designed to appear to be double-serrated.

---

[3]The 1994 New York Action did not include any claims involving the use of either two or four stripes on athletic shoes.  All of the claims involved Payless' use of three stripes on footwear.

PAGE 6 - REDACTED OPINION AND ORDER

On October 8, 2002, Magistrate Judge Jelderks granted Payless' motion for summary judgment based on the 1994 Settlement Agreement, and dismissed all of adidas' trademark infringement claims.  Judge Jelderks concluded that the 1994 Settlement Agreement only prohibited Payless from selling shoes with stripes that were "actually 'double-serrated.'"  He concluded adidas' trademark infringement claims were barred because the shoes at issue plainly did not have serrated edges.  On January 6, 2003, Judge Haggerty adopted Magistrate Judge Jelderks' Findings and Recommendation.

adidas appealed Judge Haggerty's decision to the Ninth Circuit.  In June 2004, Judge Redden stayed the case pending the Ninth Circuit's decision on the merits.  In January 2006, the Ninth Circuit reversed.  In so doing, the court concluded:

> A plain reading of the agreement demonstrates that Adidas released only those claims against Payless that Adidas "brought or could have brought" before the dismissal of the action that was the subject of the settlement. The shoe stripe designs at issue in the present dispute, however, were not produced by Payless until after the 1994 agreement was concluded. Adidas could not have brought a claim against shoes not in existence prior to the execution of the settlement. Therefore, the 1994 settlement agreement does not preclude Adidas's [sic] present Lanham Act claims against Payless.

adidas America, Inc. v. Payless Shoesource, Inc., 166 Fed. Appx. 268, 270-71 (9th Cir. 2006).

### C. adidas' Third Amended Complaint

On June 20, 2006, Judge Redden lifted the stay in this case.  In August 2006, adidas filed its Third Amended Complaint, adding 231 specific "shoe lots" to the 37 previously at issue.[4]

---

[4] Payless assigns each of its shoe models a different "lot number" for tracking purposes. For example, Payless sells several different models of a shoe called the "4-Stripe," which adidas claims infringes on the adidas Superstar.  Payless sells a navy blue 4-Stripe, a light blue 4-Stripe, a black on white 4-Stripe, a white on white 4-Stripe, and so on.  Similarly, Payless sells a men's, a women's, and a kid's version of each shoe.  Payless assigns each color scheme/style a different "lot number."

Though adidas objects to 268 different "shoe lots" in this case, most of those accused "lots" are essentially variations of nine distinct styles of footwear that adidas claims Payless is infringing: the Superstar, Country Ripple, Tuscany, adi Racer, Pranja, Copa Mundial, Campus, Samoa, Stan Smith Millennium, and Mei.  Although some of the accused shoes bear little or no resemblance to any of the above-mentioned shoe styles, they all share one common characteristic: two or four parallel, equidistant stripes running diagonally from the mid-sole forward to the laces.  None of the accused shoes bear three stripes.

adidas alleges Payless' two- and four-stripe footwear infringes adidas' Three-Stripe Mark and its Superstar Trade Dress.  adidas asserts eleven claims for relief, including: (1) federal trademark infringement of the Three-Stripe Mark in violation of 15 U.S.C. § 1114 First Claim); (2) federal unfair competition in violation of 15 U.S.C. § 1125(a), as to the Three-Stripe Mark and the Superstar Trade Dress (Second and Third Claims); (3) federal dilution in violation of 15 U.S.C. § 1125(c), as to the Three-Stripe Mark and Superstar Trade Dress (Fourth and Fifth Claims); (4) state trademark dilution and injury to business reputation in violation of O.R.S. § 647.107, and various other states' laws as to the Three-Stripe Mark and Superstar Trade Dress (Sixth and Seventh Claims); (5) common law infringement and unfair competition as to the Three-Stripe Mark and Superstar Trade Dress (Eighth and Ninth Claims); and (6) unfair and deceptive trade practices as to the Three-Stripe Mark and Superstar Trade Dress (Tenth and Eleventh Claims).  adidas seeks injunctive relief, as well as recovery of profits on the basis of unjust enrichment, dilution damages under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)(2), enhancement of damages pursuant to 15 U.S.C. § 1117(a), and attorney's fees and costs.

Payless asserts the affirmative defenses of laches, waiver, estoppel, abandonment, acquiescence, unclean hands, trademark misuse, and contractual estoppel. Payless also asserts the Three-Stripe mark and Superstar Trade Dress are function, and therefore not protectable under the Lanham Act. Payless alleges counterclaims for abandonment and cancellation of the Three-Stripe mark, breach of contract, and unfair competition and deceptive trade practices in violation of O.R.S. § 646.605 et seq., and various other states' laws.

adidas now moves for partial summary judgment as to each of Payless' counterclaims and all but two of Payless' affirmative defenses. Payless moves for partial summary judgment as to adidas' claims of infringement, dilution, and willfulness. In addition, Payless moves for summary judgment on its affirmative defense of laches. Based on its motion for summary judgment on the issue of willfulness, Payless also moves to strike adidas' demand for a jury trial. Finally, Payless moves to strike adidas' expert report and testimony.

## II. Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. The moving party must demonstrate an absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. Celotex, 477 U.S. at 324. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. United

Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989).

In evaluating a motion for summary judgment, the court must view all reasonable inferences in favor of the nonmoving party. Liberty Lobby, 477 U.S. at 255. Summary judgment is not appropriate where the record would allow a reasonable trier of fact to find for the nonmoving party. United States v. $69,292.00 in U.S. Currency, 62 F.3d 1161, 1166 (9th Cir. 1995). Conversely, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 323. Additionally, "[b]ecause of the intensely factual nature of trademark disputes summary judgment is generally disfavored in the trademark arena." Interstellar Starship Servs., Ltd. v. Epix, Inc., 184 F.3d 1107, 1109 (9th Cir. 1999) (citing Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1356 n.5 (9th Cir. 1985)).

## III. Discussion

### A. Payless' Motion to Strike Dr. Ford's Survey and Testimony

Payless seeks an Order striking both the August 22, 2003 Rule 26 report and the March 15, 2007 Supplemental Rule 26 expert report of Dr. Gerald Ford. Payless also seeks an order barring Dr. Ford from testifying at trial. Payless argues Dr. Ford's likelihood of confusion surveys, which focused on adidas' Superstar Trade Dress infringement claims, cannot be used to support adidas' Three-Stripe trademark infringement claims because the accused shoes are "noticeably distinguishable" from one another. Payless further contends that Dr. Ford improperly relied on likelihood of confusion surveys he conducted for adidas in other cases involving potentially infringing third-party uses of two and four-stripe designs. In essence,

Payless argues that because Dr. Ford did not conduct a likelihood of confusion survey for each of the accused shoes lots at issue, his expert reports must be stricken with respect to all of the unreviewed shoes.  I disagree.

Where actually surveyed products and subsequently accused products share common and prominent features, a trademark infringement plaintiff need not create new likelihood of confusion surveys for each newly accused product.  Indeed, Payless concedes that because "[e]ach of [the 37 lots adidas accuses of trade dress infringement] shared common features with one another, . . . it [was] arguably proper for Dr. Ford to conduct a single survey on a single shoe that contained these common features."  Payless Mem. in Supp. Of Motion to Strike, at 7 (emphasis added).  Notably, all of Payless' accused shoes, including those which Dr. Ford actually surveyed, share a common and prominent feature (i.e., two- or four- parallel, equidistant and diagonal stripes that allegedly infringe the Three-Stripe Mark).  Thus, it was "arguably proper for Dr. Ford to conduct a single survey that contained [those] common features."

Payless' also contends Dr. Ford's report must be stricken because his methodology was flawed.  Payless argues Dr. Ford improperly (1) used third-party surveys to assess whether Payless' two- and four-stripe shoes cause consumer confusion, (2) used still photographs as survey stimuli, rather than replicating actual market conditions, (3) failed to isolate adidas' claimed trade dress, and (4) use of leading questions.  Dr. Ford conducted eleven different surveys as to the likelihood of post-sale confusion caused by various brands of footwear with two or four parallel, equidistant stripes running diagonally from the mid-sole forward to the laces.  All of the surveys were conducted using the same methodology, and all of the surveyed shoes share common design features (i.e., two or four parallel, equidistant stripes).  Each of

PAGE 11 - REDACTED OPINION AND ORDER

Payless' objections go to the weight of Dr. Ford's surveys, rather than their admissibility.  <u>Wendt v. Host Intern., Inc.</u>, 125 F.3d 806, 814 (9th Cir. 1997); <u>see also</u> <u>Prudential Ins. Co. v. Gibralter Fin. Corp.</u>, 694 F.2d 1150, 1156 (9th Cir. 1982) ("Technical unreliability goes to the weight accorded a survey, not its admissibility.").  Accordingly, the motion to strike Dr. Ford's expert reports is denied.

### B. Payless' Motion for Partial Summary Judgment on adidas' Claims of Willfulness

Payless contends that its "good faith" interpretation of the 1994 Settlement Agreement, in combination with its reliance on the advice of outside counsel precludes the finding of any willful infringement.  As such, Payless seeks summary judgment on all of adidas' damages claims that are dependent on a finding of willfulness, including adidas' claims seeking: (1) recovery of profits on the basis of unjust enrichment; (2) dilution damages under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c)(2) (effective until Oct. 5, 2006); and (3) enhanced damages pursuant to 15 U.S.C. § 1117(a).

### 1. Legal Standards

As a general rule, a plaintiff must establish that the defendant engaged in willful misconduct to obtain profits under the theory of unjust enrichment. <u>Lindy Pen Co., Inc. v. Bic Pen Corp.</u>, 982 F.2d 1400, 1405-06 (9th Cir. 1993); <u>see also</u> <u>Maier Brewing Co. v. Fleischmann Distilling Corp.</u>, 390 F.2d 117, 123 (9th Cor. 1968) ("[T]he District Court reached the correct and proper conclusion when, upon finding that appellants 'knowingly, willfully and deliberately' infringed the said trade-mark . . . it granted appellees an accounting of appellants' profits.").[5]  A

---

[5]The Ninth Circuit has suggested that willfulness is not always a prerequisite to an award of a defendant's profits in a trademark infringement action.  <u>See e.g.</u>, <u>Adray v. Adry Mart, Inc.</u>, 76 F.3d 984, 988 (9th Cir. 1995) ("An instruction that willful infringement is a prerequisite to an

similar finding of willful misconduct is required for a plaintiff to recover enhanced profits and

damages under 15 U.S.C. § 1117, Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1010

(9th Cir. 1994), or damages for dilution under the FTDA. See 15 U.S.C. §§ 1125(c)(1) and (2)

(Prior to October 6, 2006, where a defendant's "commercial use" of plaintiff's trademark "causes

dilution of the distinctive quality of [the plaintiff's famous] mark," and the defendant "willfully

intended to trade on the owner's reputation or to cause dilution of the famous mark," the owner

of the famous mark "shall . . . be entitled to the remedies set forth in section[] 1117(a) . . . .").

    "Willful [misconduct] carries a connotation of deliberate intent to deceive.  Courts

generally apply forceful labels such as 'deliberate,' 'false,' 'misleading,' or 'fraudulent' to conduct

that meets this standard." Lindy Pen, 982 F.2d at 1406 (citing Bangdag, Inc. v. Al Bolser's Tire

Store, Inc., 750 F.2d 903, 918-19 (9th Cir. 1984)).  The infringement must be "willfully

calculated to exploit the advantage of an established mark." Lindy Pen, 982 F.2d at 1405; see

also Danjaq LLC v. Sony Corp., 263 F.3d 942, 957-58 (9th Cir. 2001) ("[W]illful" means

"conduct that occurs with knowledge that the defendant's conduct constitutes . . . infringement");

Maier Brewing, 390 F.2d at 123 (Willfulness where the defendant is "attempting to gain the

value of an established name of another."); ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d

958, 966 (D.C. Cir. 1990) (A finding of willfulness "require[s] a connection between a

---

award of defendant's profits may be error in some circumstances (as when plaintiff seeks the
defendant's profits as a measure of his own damage . . . ).") (internal citation omitted); Java Jazz,
Inc. v. Jazzland, Inc., 109 Fed. Appx. 159, 162 (9th Cir. Aug 27, 2004) (holding that it was not
error to instruct the jury that plaintiff was entitled to defendant's profits resulting from
infringement without referring to willfulness); Polo Fashions, Inc. v. Dick Bruhn, Inc., 793 F.2d
1132, 1134 (9th Cir. 1986) (finding that an award of profits was appropriate without reference to
willfulness).  Because Payless' present motion merely seeks a ruling that it did not act willfully, I
find it unnecessary to address whether a finding of willfulness is, in fact, a prerequisite to an
award of profits under the Lanham Act.

defendant's awareness of its competitors and its actions at those competitors' expense.").  "[T]he primary consideration is whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing." SRI Int'l, Inc. v. Advanced Tech. Labs., 127 F.3d 1462, 1464-65 (Fed. Cir. 1997). Thus, willful infringement is a question of fact that turns on the defendant's state of mind, and "is often accompanied by questions of intent, belief, and credibility."  Id. at 1465; see also Ortho Pharm. Corp. v. Smith, 959 F.2d 936, 944 (Fed Cir. 1992) ("Whether infringement is 'willful' is by definition a question of the infringer's intent.").

**2. The 1994 Settlement Agreement**

In the 1994 Settlement Agreement, adidas agreed to dismiss its claims against Payless and to release any claims that it "brought or could have brought" based on Payless' use of "two or four parallel double-serrated stripes" on footwear.  Payless agreed not to sell shoes "bearing two or four parallel double-serrated stripes of contrasting color running diagonally from the outsole to forward to the lacing area."  Payless argues that based on its interpretation of the agreement, it reasonably believed it could continue to sell shoes with two and four parallel stripes without infringing adidas' rights, so long as its stripes did not have "double-serrated" edges.  Payless argues that its reliance on the 1994 Settlement Agreement necessarily precludes a finding of willful infringement as a matter of law.  I disagree

Payless' purported reliance on the 1994 Settlement Agreement does not preclude a finding of willfulness because the agreement did not say that if Payless refrains from using double-serrated stripes, its use of parallel stripes can never violate adidas' trademark rights.  As the Ninth Circuit noted, the agreement contains no forward-looking statements that preclude

PAGE 14 - REDACTED OPINION AND ORDER

adidas from ever bringing another trademark infringement claim against Payless based on the use of stripes on shoes. The 1994 Settlement Agreement simply prohibited Payless from selling shoes with the specific design features then at issue—namely, double-serrated stripes. It did not authorize Payless to intentionally infringe adidas' Three-Stripe mark so long as Payless avoided using serrated stripes in doing so. In any event, Payless' supposed reliance on its interpretation of the 1994 Settlement Agreement cannot shield it from liability for conduct that continued (and continues to occur) long after the Ninth Circuit expressly rejected that interpretation. A fact-finder could reasonably find that Payless' continued reliance on its flawed interpretation of the 1994 Settlement Agreement was unreasonable.

Finally, adidas submitted circumstantial evidence that tends to undermine Payless' claim that any infringement was, as a matter of law, non-willful. Many of the accused Payless shoes are nearly identical to adidas' shoes, and Payless acknowledges that adidas' shoes were the "inspiration" for the some of the accused shoes. See Feldman Decl., Ex. 60 ("What are the current inspirations for these styles? . . . adidas 'clima cool'"); id. Ex. 63 ("These new adidas inspired looks are great . . . the Adidas [sic] inspired white 4 stripe low is a top seller."). Moreover, Payless employees referred to many of the accused shoes by the name of the corresponding adidas model, or simply as adidas "knock-offs." Id. Ex. 44 ("we need more Nike & adidas 'running' knock-offs"); id. Ex. 76 ("an adidas look a like 4-stripe"); id. Ex. 31 (these orders are for the country ripple jogger"); id. Ex. 55 ("samoa has already been purchased"); id. Ex. 61 ("on the adidas 4-stripe TAM16701 the factory has been confirmed as follows . . . ."). This evidence at least raises genuine issues of material fact as to whether Payless attempted to avoid adidas' styles after executing the 1994 Settlement Agreement, or instead continued to

manufacture adidas imitations.  On this record, a jury could reasonably conclude that Payless did not in fact rely on the 1994 Agreement and that its interpretation of the agreement was both unreasonable and willful.  Accordingly, the 1994 Settlement Agreement does not entitle Payless to summary judgment on the issue of willfulness.

### 3. Advice of Counsel

A defendant's reliance on the advice of counsel is relevant to the question of willfulness. Columbia Picture Television, Inc. v. Krypton Broad. of Birmingham, 259 F.3d 1186, 1196 (9th Cir. 2001).  Generally, obtaining the advice of counsel generally negates a finding of willfulness unless the advice is ignored or is found to be incompetent.  Chiron Corp. v. Genentech, Inc. 268 F. Supp. 2d 1117, 1121 (E.D. Cal. 2002) (citing Comark Comm., Inc. v. Harris Corp., 156 F.3d 1182, 1191 (Fed. Cir. 1998)).  Before a court will consider the exculpatory value of an opinion of counsel, however, "the legal advice contained therein must be found on the totality of the circumstances to be competent such that the client was reasonable in relying upon it." Comark, 156 F.3d at 1191.  If the opinion is not competent, then it is of little value in showing the good faith belief of the infringer.  Id.

Whether advice is competent, and whether it was reasonable to rely on the advice, depends on several factors, including: (1) the background research performed by the attorney; (2) whether the opinions were written or oral; (3) the objectivity of the opinions; (4) whether the attorneys rendering the opinions were trademark lawyers; (5) whether the opinions were detailed or merely conclusory; and (6) whether material information was withheld from the attorney. Chiron, 268 F. Supp. 2d at 1121 (citing Comark, 156 F.3d at 1191; 7 Chisum, Chisum on Patents

§ 20.03[4][b][v][D], at 20-368 to 20-374 (2002)).[6]  The advice of counsel "must be thorough

enough, as combined with other factors, to instill a belief in the infringer that a court might

reasonably hold the patent is invalid, not infringed, or unenforceable."  Ortho Pharm., 959 F.2d

at 944.

It is undisputed that Payless obtained infringement "risk assessments" from outside

counsel who specialized in trademark law.  There are, however, significant questions as to

whether Payless' counsel actually reviewed each of the shoes at issue in this case and whether

the reviews were conducted before the commencement of this lawsuit.  For example, Payless

acknowledges that it did not obtain any advice as to its allegedly infringing version of the Stan

Smith Millennium.  As a matter of law, Payless' advice of counsel defense fails as to Payless'

allegedly infringing versions of that shoe because a party cannot rely on advice that it did not

seek or obtain.  Payless' conclusory assertion that its version of the Stan Smith looks nothing like

the adidas version does not alter that conclusion.

Furthermore, there are genuine issues of fact as to whether Payless' counsel actually

reviewed each of the shoes at issue.  Payless has produced "shoe review" documents for only 40

of the 267 shoe lots in dispute.  Of the reviewed shoe lots, five were reviewed only for trade

dress concerns, and not trademark concerns.  With respect to the unreviewed shoes, it is difficult

to see how Payless can rely on advice that it did not actually seek or obtain.

---

[6]Though Chiron Corp. v. Genentech, Inc. 268 F. Supp. 2d 1117 (E.D. Cal. 2002),
analyzed the advice of counsel defense in the context of patent infringement, both parties cite to
the decision.  Given the similarities between trademark law and patent law, the Chiron factors
are relevant to the advice of counsel defense in the context of trademark infringement.  Payless
notes the exact language for the first Chiron factor is "whether counsel examined the patent file
history."  Id. at 1121.  Because there is no "patent file history" in a trademark case, I will
consider the background research conducted by Payless' counsel.

I am not persuaded by Payless' argument that even though it did not conduct actual reviews of each of the accused shoes, all of its shoes were "effectively" reviewed because once a particular design had been approved, the "approval . . . carried over to any other proposed shoe that shared the exact same design pattern." Payless Reply, at 19. The problem with this argument is that these so-called "effectively" reviewed shoe lots are *not* exactly the same as the actually reviewed shoe lots. Payless acknowledges that the "effectively" reviewed lots were offered in different colors and materials, and marketed to different customers (*i.e.*, men, women, or children). Furthermore, some of these "effectively" reviewed lots relate back to actual shoe reviews that were conducted *prior* to the Ninth Circuit's rejection of Payless' interpretation of the 1994 Settlement Agreement. Notably, Payless' attorneys did not alter any infringement "risk assessments" after the Ninth Circuit held that nothing in the agreement precluded adidas from bringing suit for infringement based on the use of straight-edge stripes.

In addition, many of the shoe reviews upon which Payless purportedly relied were conducted <u>after</u> adidas initiated this lawsuit. Of the shoe reviews submitted by Payless in support of its motion, only four pre-date the filing of this action in 2001. It is difficult to see how Payless could have relied in good faith upon advice that it did not seek or obtain until <u>after</u> adidas filed suit for willful infringement. <u>Cf</u>. <u>Chiron</u>, 268 F. Supp. 2d at 1123, n.4 (quoting O'Malley, et al., <u>Federal Jury Practice & Instructions</u> § 19.08, at 885 (5th ed.2000) (noting that like the advice of counsel defense in the criminal law context, the advice of counsel defense is available in the infringement arena "if, '<u>before</u> [acting or failing to act], [the d]efendant, while acting in good faith and for the purpose of securing advice on the lawfulness of [his] possible <u>future</u> conduct, sought and obtained the advice of an attorney whom [he] considered to be

PAGE 18 - REDACTED OPINION AND ORDER

competent, and made a full and accurate report or disclosure to this attorney of <u>all</u> important and material facts of which [he] had knowledge or had the means of knowing, . . .") (emphasis and alterations in original).  Payless' failure to obtain advice of counsel <u>before</u> engaging in the conduct at issue undermines its contention that it acted in good faith reliance on the advice of its counsel.  It also raises the inference that the opinions were designed simply to bolster Payless' advice of counsel defense.

There are also genuine issues of material fact as to whether the advice obtained by Payless was objective, and whether Payless' counsel considered all relevant information in forming their opinions.  For example, Payless' counsel made little or no effort to determine whether its use of stripes actually caused consumer confusion, or infringed upon adidas' trademark.  There is no evidence that Payless' attorneys considered the fact that Payless' shoes were "inspired" by adidas' shoes—that is, Payless' intent in selling the accused shoes.  There is little evidence that Payless' attorneys considered the degree of care exercised by the average purchaser, the relatedness of the parties' goods, the similarity of the marks, or the similarity of the trade or marketing channels of the respective products.  In other words, there is little evidence that Payless' attorneys considered any of the likelihood of confusion factors that the Ninth Circuit has expressly instructed courts to consider in evaluating infringement claims.  <u>See</u> <u>Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.</u>, 109 F.3d 1394, 1404 (9th Cir. 1997) ("The eight-factor <u>Sleekcraft</u> test is used in the Ninth Circuit to analyze the likelihood of confusion in <u>all</u> trademark infringement cases . . . .") (emphasis added).  As previously noted, Payless' counsel did not alter any of the infringement "risk assessments" after the Ninth Circuit rejected Payless' interpretation of the 1994 Settlement Agreement.

PAGE 19 - REDACTED OPINION AND ORDER

Under these circumstances, a jury could reasonably find that Payless' attorneys lacked important information and rendered judgments about the likelihood of confusion and the risk of infringement without considering all of the facts that should inform such an analysis. Because the opinions were not based on all material information, a jury could also reasonably find that the opinions were not competent, and thus, Payless' reliance on those opinions was unreasonable.[7]

Perhaps the most telling characteristic of the opinion letters proffered by Payless, is the conclusory and superficial nature of the opinions themselves. In many cases, the entire substance of Payless' counsel's "detailed" advice consists of a single phrase or sentence. See e.g., Horace Decl. Ex. B, p.1 ("XXX XXX"; regarding Campus); id. Ex. C, p.1 ("XXX XX XXXXXXXX XX XXXX XXXX XX XXXXXXX XX XX XXXX XX XXX X XXXX XXX

_____

[7]In an apparent effort to overcome the fact that its counsel did not analyze any of the Sleekcraft "likelihood of confusion" factors, Payless asserts that its shoe reviews were concerned solely with the "risk of drawing an infringement complaint," not with conducting actual infringement analyses. Def.'s Reply, at 5. This argument directly contradicts Payless' memorandum in support of the motion, in which Payless referred to the reviews as infringement analyses. See Def.'s Mem. in Support, at 1 (Payless "submitted its proposed shoe designs . . . to outside counsel for an infringement analysis"); id. at 2 ("detailed analysis designed to ensure that the shoes did not infringe on the rights of adidas"); id. at 3 ("XXX XX XXXXXXXX XXXXXX XXXXX XXXXX XXXX XXX XXXXXXXX XXX XXXXXXXXXX XXXX XXX XXXX XXXXXX XXX XXX XXXXXXXX XXX XXXXXX XX XXXXXX"); id. at 12 ("great care to ensure that its designs did not infringe the rights of any other party"). In any event, Payless' distinction undermines its argument. In the trademark context, the advice of counsel defense is concerned with "whether a prudent person had reason to believe that the [trademark] was not infringed," not whether Payless' counsel believed there was a low-to-moderate risk of drawing an infringement complaint. SRI Int'l, 127 F.3d at 1465. In other words, whether Payless believed there was a risk of getting sued has little to do with whether its shoes *actually infringed* adidas' mark. Further, the dispute as to how to characterize the reviews highlights the substantial issues of fact regarding the thoroughness and substance of the opinions. In many cases, the advice consists of a single sentence, which makes it difficult to determine the nature of the advice, let alone whether the advice was competent as a matter of law.

PAGE 20 - REDACTED OPINION AND ORDER

XX XXXXXX"; regarding Copa); id., Ex. D, p.14 ("XXXXXXXX XXXXXX XXXXXXXXXX XXX XX XXXX XXXXX XXX XXXXX XXX XXXXXXXX XXXXXX XXXXX"; regarding 4-Stripe Country Ripple); id., Ex. J, p.1 ("XXX XXXXXXXX"; regarding men's Tuscany); id., Ex. K, p.1 ("XXX XXXXXXXX"; regarding kids Tuscanny); id., Ex. N, p.1 ("XXXX XX XXXXXXXX XXXX XXX XXX XXXXXX XXXX XXXXXXX XXX XX XXXXXXXX XXXX XX XXXX XX XX XXXXXXX XXXXXX XXXXXX XXX XXXXXXX XXXX XXXX XXXXXXXX"; regarding Samoa); id., Ex. Q, p.1-2 ("XX XXXXXXXXX XXXXXX XXXXX"; "XXX XXXXX XXXXX XXXX XXXXX XX XXXXXXXXX XX XXXXXXXX XXXXXX XXXXXXXX XXX X XX XXX XXXXXX XXX"; XXX XXXXX XXX XXXX XXXXXXX XXXXXXX";  regarding four-stripe Superstar) (emphasis in original).[8]  These conclusory and unsupported opinion letters are devoid of any legal or factual analysis explaining the conclusion reached.

Notably, Payless neither cites, nor is the court aware of any case in which a defendant's reliance on the kind of opinion letters proffered here entitled that defendant to summary judgment on the issue of willfulness.  In Chiron Corp. v. Genentech, Inc., 268 F. Supp. 2d 1117 (E.D. Cal. 2002), the primary case upon which Payless relies, the court denied a defendant's motion for summary judgment on the advice of counsel defense despite the fact that the defendant obtained a "fifty-six page letter [that was] thorough, detailed, cite[d] relevant case law, and was drafted by patent attorneys." Chiron, 268 F. Supp. 2d at 1122.  The court concluded that factual issues remained as to the competency of counsel's advice because the defendant failed to

_____

[8]Confidential attorney-client communications have been redacted. The non-redacted Opinion and Order has been filed under seal.

provide counsel with all material information, and it was unclear whether the opinions were conveyed orally and whether the opinions were "conclusory and given without supporting reasons." Id. at 1122-25.  In stark contrast to the thorough and detailed fifty-six page opinion letter that the court found insufficient to preclude willfulness in Chiron, Payless has proffered opinion letters from counsel that do not even extend to fifty-six words, fail to cite any relevant legal authority, and provide no legal or factual analysis.

On this record, there are genuine issues of material fact as to whether the advice of counsel obtained by Payless was competent as a matter of law.  As such, I conclude that Payless' purported reliance on such advice is insufficient to defeat adidas' claim of willfulness as a matter of law.  See SRI Int'l, 127 F.3d at 1466 (affirming rejection of advice of counsel defense because the advice was "conclusory and woefully incomplete . . . , lacking both legal and factual analysis, . . . [and] insufficient to meet the standard of due care appropriate to serve as an exculpatory opinion of counsel.") (internal quotation marks omitted); Underwater Devices, Inc. v. Morrison-Knudsen Co., 717 F.2d 1380, 1390 (Fed. Cir. 1983) (affirming rejection of advice of counsel defense because opinion memo contained only "bald, conclusory and unsupported remarks"), overruled on other grounds by In re Seagate Tech., LLC, 497 F.3d 1360 (Fed. Cir. 2007); Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc., 909 F. Supp. 896, 907 (S.D.N.Y. 1995) (rejecting advice of counsel defense because opinion letter could "be described, at best, as superficial, containing no analysis explaining the conclusion reached.").  Where, as here, there are disputed issues of material fact and the analysis turns ultimately on questions of intent, credibility, and state of mind, summary judgment is generally inappropriate.  Mendocino Envtl. Ctr. v. Mendocino County, 192 F.3d 1283, 1302 (9th Cir. 1999).  Thus, Payless' motion for

summary judgment on adidas' claims of willfulness is denied.

## C. Payless' Motion for Partial Summary Judgment on adidas' Claims for Trademark and Trade Dress Infringement

Payless seeks summary judgment on all of adidas' claims for trademark and trade dress infringement. Payless argues there is no likelihood of confusion between its use of two- and four-parallel stripes and adidas' Three-Stripe trademark.

### 1. Legal Standards

To prevail on a trademark or trade dress infringement claim under the Lanham Act, a plaintiff must prove that the alleged infringer used the plaintiff's validly registered trademark or trade dress "in commerce," and that the use is "likely to cause confusion, or to cause mistake, or to deceive consumers" as to the source of the product. Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1134 (9th Cir. 2006); Karl Storz Endoscopy-Am., Inc. v. Surgical Tech., Inc., 285 F.3d 848, 853-54 (9th Cir. 2002).[9] In the Ninth Circuit, neither an intent to confuse, nor actual confusion are required elements of a trademark infringement claim. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1256 n.16 (9th Cir. 1982); Brookfield Comm., Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1050 (9th Cir. 1999). Instead, the central inquiry is whether a "reasonably prudent customer in the marketplace is likely to be confused as to the origin of the

---

[9]15 U.S.C. § 1114 provides in relevant part: (1) Any person who shall, without the consent of the registrant-

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

good or service bearing one of the marks" because of the similarities between the two marks

Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129 (9th Cir. 1998); see also

Academy of Motion Picture Arts & Scis. v. Creative House Promotions, Inc., 944 F.2d 1446,

1456 (9th Cir. 1991) (Likelihood of confusion exists "whenever consumers are likely to assume

that a mark is associated with another source" because of the similarities between the two

marks). Likelihood of confusion is considered by examining the "total effect of the defendant's

product and package on the eye and mind of an ordinary purchaser." First Brand Corp. v. Fred

Meyer, Inc., 809 F.2d 1378, 1383-84 (9th Cir. 1987).

In the Ninth Circuit, courts examine the following eight factors in evaluating the

likelihood of confusion: (1) the similarity of the marks; (2) the relatedness of the parties' goods;

(3) the similarity of trade or marketing channels; (4) the strength of the plaintiff's marks; (5)

defendant's intent; (6) evidence of actual confusion; (7) the degree of care exercised by the

average purchaser; and (8) the likelihood of expansion into other markets. AMF Inc. v.

Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).

Regardless of the type of alleged confusion at issue—point-of-sale, initial interest, or

post-sale confusion—the court's likelihood of confusion analysis should be guided by an

evaluation of the so-called Sleekcraft factors. Interstellar, 304 F.3d at 942 ("To evaluate the

likelihood of confusion, including initial interest confusion, the so-called Sleekcraft factors

provide non-exhaustive guidance."); Academy of Motion Picture Arts & Scis., 944 F.2d at 1446

(stating in the post-sale confusion context, "the ultimate test is whether the public is likely to be

deceived or confused by the similarity of the marks"); see also Dr. Seuss, 109 F.3d at 1404 ("The

eight-factor Sleekcraft test is used in the Ninth Circuit to analyze the likelihood of confusion

question in <u>all</u> trademark infringement cases.") (emphasis added); <u>Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP</u>, 423 F.3d 539, 550 n.15 (6th Cir. 2004) ("evidence of initial-interest confusion comes into the eight-factor [likelihood of confusion] test as a substitute for evidence of actual confusion").  The eight-factor <u>Sleekcraft</u> test is not a rigid one, however, and "[o]ther variables may come into play depending on the particular facts presented." <u>Sleekcraft</u>, 599 F.2d at 348 n.11; <u>see also</u> <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1141 (9th Cir. 2002) (Likelihood of confusion is not determined by mechanically counting the number of factors that weigh in favor of each party, or by giving the same weight to a particular factor in each case). Additionally, "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." <u>Interstellar</u>, 184 F.3d at 1109 (citation omitted).

### 2. Analysis of the Sleekcraft Factors

#### a. Similarity of the Marks

"The first <u>Sleekcraft</u> factor—the similarity of the marks—has always been considered a critical question in the likelihood-of-confusion analysis." <u>GoTo.Com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000).  "[T]he greater the similarity between the two marks at issue, the greater the likelihood of confusion." <u>Id</u>. at 1206.  In the similarity analysis: "(1) Marks should be considered in their entirety and as they appear in the marketplace; (2) Similarity is best adjudged by appearance, sound, and meaning; and (3) Similarities weigh more heavily than differences." <u>Entrepreneur Media</u>, 279 F.3d at 1144.  "[S]imilarity of design is determined by considering the overall impression created by the mark as a whole rather than simply comparing individual features." <u>Exxon Corp. v. Texas Motor Exch., Inc.</u>, 628 F.2d 500, 505 (5th Cir.

1980).

Here, the similarities between Payless' stripe designs and adidas' Three-Stripe Mark are unmistakable.  Like adidas' Three-Stripe Mark, Payless' stripes contrast with the background color of the shoe, and run parallel, at the same angle, from the mid-sole of the shoe diagonally forward to the laces.  "Considered in their entirety and as they appear in the marketplace," the stripe designs on Payless' athletic and casual shoes are similar to adidas' Three-Stripe Mark. Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1392 (9th Cir. 1993).

With respect to Payless' allegedly infringing imitation of adidas' Superstar Trade Dress, the similarities are even more striking.  Like the adidas' Superstar, Payless' shoe prominently displays parallel, equidistant stripes, running parallel to small equidistant holes on the sides of the shoes.  Both versions of the Superstar have a rubber "shell toe" design, a particularly flat sole, and a similarly shaped heel patch.  Notably, Payless' rubber "shell toe" designs—the overall shape, raised lines fanning out (like a sea shell), even the tiny "x's" embossed between the ridges of the toe—are almost indistinguishable from the adidas' "shell toe."

As even Payless repeatedly points out, the only readily discernable difference between Payless' use of stripes and adidas' Three-Stripe Mark is that Payless' shoes display two or four stripes, not three.  Payless' argument is that because "two or four stripes do not equal three stripes," there can be no actionable similarity between its use of two and four stripe designs and adidas' Three-Stripe Mark.  I disagree.

Payless cannot avoid liability for infringement merely by adding (or subtracting) an identical, parallel stripe to adidas' Three-Stripe Mark.  "[W]hat is critical is the overall appearance of the mark as used in the marketplace, not a deconstructionist view of the different

PAGE 26 - REDACTED OPINION AND ORDER

components of the marks." Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1283 (W.D. Wash. 2003), aff'd, 376 F.3d 894 (9th Cir. 2004) (emphasis in original). As one court aptly noted, "few would be stupid enough to make exact copies of another's mark or symbol. It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." Baker v. Master Printers Union, 34 F. Supp. 808, 811 (D. N.J. 1940). Here, although there may be minor differences between Payless' use of stripes and adidas' Three-Stripe mark, "the overall impression created by the marks is essentially the same, [and thus] it is very probable that the marks are confusingly similar." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 24:22 (4th ed. 2007) (emphasis added); see also GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1206 (9th Cir. 2000) (finding actionable similarity despite use of different colors in logo); Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (9th Cir. 1988) (actionable similarity between "Century Investments & Realty" and "Century 21"); Saks & Co. v. Hill, 843 F. Supp 620, 622 (S.D. Cal. 1993) ("Saks Thrift Avenue" likely to be confused with Saks Fifth Avenue"); Nabisco Brands, Inc. v. Kaye, 760 F. Supp. 25, 27 (D. Conn. 1991) ("A2" steak sauce likely to be confused with "A1" steak sauce).

Furthermore, courts have considered and rejected Payless' "two or four does not equal three" mathematical argument in related cases related involving the likelihood of similarity between adidas' Three-Stripe Mark and two- and four-stripe shoes:

> From the mathematical premise that three does not equal four, defendants argue that, as a matter of law, the use of a four stripe design on the side of a casual shoe cannot be confusingly similar to adidas' Three Stripe Mark. Defendants posit that to find otherwise would grant adidas a monopoly over the use of stripes as decorations on the sides of all sports shoes.

PAGE 27 - REDACTED OPINION AND ORDER

This argument is not well taken. Although three stripes obviously do not equal four stripes, the issue is not simply the number of stripes. Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary purchaser. While there can be no debate that defendants' four stripe mark has one stripe more than adidas' Three Stripe Mark, so too there can be no debate that many of the other features of the stripes displayed on defendants' [shoes] are strikingly similar - if not identical - to the features of the Three Stripe Mark displayed on [adidas'] Superstar IIK and Campus II models. . . . The stripes are equal in size, are placed equidistant at a similar or identical angle, are in substantially the same location between the sole and the reinforced area which supports the shoelace holes (with the necessary adjustment to accommodate four rather than three stripes), are displayed in colors which contrast with the background color of the shoes, and have serrated edges. Thus, this court cannot simply count the number of stripes and determine as a matter of law that four stripes are not confusingly similar to three stripes.

adidas-Salomon AG v. Target Corp., 228 F. Supp. 2d 1192, 1211 (D. Or. 2002); see also ACI

Int'l, Inc. v. adidas-Solomon AG, 359 F. Supp. 2d 918, 922 (C.D. Cal. 2005) ("The Court

expressly rejects [defendant's] argument that confusion cannot occur because its shoe has two

stripes instead of three . . . .").  Given these previous rulings and the clear similarities between

the parties' respective stripe designs, I conclude that, as a matter of law, there is an actionable

similarity between Payless' use of two or four stripes and the Three-Stripe Mark.

### b. Relatedness or Proximity of the Parties' Goods

"Related goods are generally more likely than unrelated goods to confuse the public as to

the producers of the goods."  Brookfield, 174 F.3d at 1055; see also E & J Gallo Winery v. Gallo

Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where goods are related or complementary,

the danger of consumer confusion is heightened.").  In determining whether the product is likely

to confuse, "less similarity between the marks will suffice when the goods are complementary,

the products are sold to the same class of purchasers, or the goods are similar in use and

function." Sleekcraft, 599 F.2d at 350 (citations omitted).  Related goods are those "which would

PAGE 28 - REDACTED OPINION AND ORDER

be reasonably thought by the buying public to come from the same source if sold under the same mark." Id. at 348 n.10 (citation omitted).

Here, the parties' products are essentially identical in use and function. Both parties sell athletic and casual footwear. Aside from arguable differences in quality, the parties' products are "reasonably interchangeable by buyers for the same purposes," and thus competitive. McCarthy § 24.23. Where goods are directly competitive, "the degree of similarity of the marks needed to cause likely confusion is less than in the case of dissimilar goods . . . ." Id. § 24.22. Given the substantial similarity of the marks at issue, see supra Section III.C.2.a, I find that this Sleekcraft factor weighs heavily in favor of finding a likelihood of confusion. See adidas v. Target, 228 F. Supp. 2d at 1212-13 (denying defendant's motion for summary judgment on infringement claims, and noting "[t]his factor favors adidas since defendants are using a four stripe design on a nearly identical product of athletic shoes"); see also Brookfield, 174 F.3d at 1056 ("In light of the virtual identity of the marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

### c. Similarity of Trade or Marketing Channels

A consideration of how and to whom the respective goods of the parties are sold is relevant to the issue of likelihood of confusion. McCarthy § 24:51. "Convergent marketing channels increase the likelihood of confusion." Sleekcraft, 599 F.2d at 353. In addition, when the "general class" of purchasers of the parties' respective products is the same, confusion is more likely. Id. On the other hand, significant differences in the price of the products, or the type of stores (e.g., discount or specialty) at which the respective products are sold may decrease the likelihood of confusion. L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 1134

PAGE 29 - REDACTED OPINION AND ORDER

(Fed. Cir. 1993).

Although adidas' and Payless' shoes are generally sold through different retail outlets and at different prices, adidas has submitted evidence that the parties' marketing channels are similar, and that the parties compete for at least some of the same customers.  In fact, Payless' counsel conceded that the parties' markets "certainly overlap."  Knops Dep. 103:14-104:1.  adidas and Payless place advertisements for their respective products in the same magazines, and on the same Internet websites. Feldman Decl. Exs. 35-36, 92-94.  Further, at least some of the Payless shoes at issue were actually sold in stores where adidas' shoes were also sold.  Id. Ex. 34, 37. Though not identical, there is evidence the parties' marketing channels partially overlap.

Even if the Payless and adidas' marketing channels were completely incongruous (which they are not), this factor would not necessarily favor Payless because channels of trade are largely irrelevant in determining the likelihood of *post*-sale confusion.  Indeed, factors such as channels of trade are "directed to <u>pre</u>-sale confusion," and are "immaterial to . . . whether actionable confusion is likely to occur <u>after</u> the marked product has entered the public arena." <u>Payless v. Reebok</u>, 998 F.2d 985, 989-90 (Fed. Cir. 1993) (emphasis in original).  This is because "post-sale observers may be unaware that Payless and [adidas] shoes are sold in different stores or at different prices, yet their confusion may be detrimental to [adidas]."  <u>Id</u>. at 990.  Given the similarity of the parties' respective products and adidas' credible evidence of the overlap of marketing channels, I find this factor favors adidas.

### d. Strength of the Mark

The scope of protection afforded a trademark "depends upon the strength of the mark, with stronger marks receiving greater protection than weak ones." <u>Entrepreneur Media</u>, 279 F.3d

at 1141; see also GoTo.com, 202 F.3d at 1207 ("The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws.").  The strength of the trademark is evaluated in terms of its conceptual strength and commercial strength.  GoTo.com, 202 F.3d at 1207.

With respect to conceptual strength, marks are generally classified by their placement on a continuum of increasing distinctiveness: generic, descriptive, suggestive, and  fanciful or arbitrary.  E. & J. Gallo, 967 F.2d at 1291.  Suggestive, fanciful, and arbitrary marks are deemed inherently distinctive and entitled to the most protection because their intrinsic nature serves to identify a particular source of a product.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992).[10]  In contrast, "generic" marks—or, names that refer to an entire class of products—are the weakest and receive no trademark protection. Id.  A "descriptive" (e.g., one that describes the quality or features of a product) mark may be entitled to protection only if it has acquired distinctiveness through secondary meaning.  Two Pesos, 505 U.S. at 769.  Secondary meaning is the consumer's association of the mark with a particular source.  E. & J. Gallo, 967 F.2d at 1291.  In other words, to be entitled to trademark protection, the owner of a merely descriptive trademark must show that buyers identify that mark with a single commercial source. McCarthy § 15:1.

With respect to conceptual strength, this court found in a related case that the adidas

---

[10]A fanciful mark is "a coined word or phrase, such as Kodak, invented solely to function as a trademark." Official Airline Guides, Inc. v. Goss, 6 F.3d 1385, 1390 (9th Cir. 1993).  An arbitrary mark is a common word that is "non-descriptive of any quality of the goods or services." Id.  "A suggestive mark is one for which a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, . . . the mark does not describe the product's features but suggests them."  Entrepreneur Media, 279 F.3d at 1142 (citation omitted).

Three-Stripe Mark was "arbitrary because three stripes do not define, describe or suggest the various products that bear them." adidas v. Target, No. 01-1582-RE, slip op. at 13 (D. Or. Jan. 29, 2003). Though the spectrum of distinctiveness does not easily translate into the world of shapes and images, McCarthy §§ 8:13, 11:2, I agree with this court's previous conclusion that the Three-Stripe Mark is strong and entitled to protection. Indeed, Payless' own attorneys have acknowledged as much. Knops Dep. at 132:20 to 133:12 ("Q: Did you believe the adidas three-stripe mark was in fact a strong mark? A: Yes.").

Even if the Three-Stripe Mark is not inherently distinctive, a fact-finder could reasonably conclude that adidas' Three-Stripe Mark and Superstar Trade Dress have acquired distinctiveness through secondary meaning. adidas owns a valid and incontestable registration for the Three-Stripe Mark, which serves as conclusive proof that the mark has secondary meaning. Entrepreneur Media, 279 F.3d at 1142 n.3. adidas has also submitted evidence that it has expended hundreds of millions of dollars in promoting the sale of its goods bearing both the Three-Stripe Mark and Superstar Trade Dress. Pierpoint Decl. ¶ 20. The Three-Stripe Mark has been used in connection with numerous high-profile sports events, organizations, and athletes. Pierpoint Decl. ¶¶ 21-23, 29. adidas' substantial advertising and promotional efforts are significant evidence of the strength of its mark. See Committee for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 822 (9th Cir. 1996) (affirming trial court's finding of secondary meaning based on "significant" advertising); Guess?, Inc. v. Tres Hermanos, 993 F. Supp. 1277, 1280 (C.D. Cal. 1997) ("Strength of mark is demonstrated by extensive advertising . . . ."). adidas submitted evidence of billions of dollars in sales of products bearing the Three-Stripe Mark and Superstar Trade Dress, which is also significant evidence of secondary meaning. Transgo, Inc.

PAGE 32 - REDACTED OPINION AND ORDER

v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1016 (9th Cir. 1985); see also Century 21 Real
Estate, 846 F.2d at 1179 ("Evidence of strength of [plaintiff's] mark includes . . . sales in excess
of one billion dollars.").  In addition, adidas' extensive evidence of unsolicited media attention
supports a finding of secondary meaning. See Golden Door, Inc. v. Odisho, 646 F.2d 347, 350-
51 (9th Cir. 1980) (evidence of extensive media coverage supported district court's determination
that the mark had acquired national recognition).  Given the previous court findings on this issue
and the significant evidence that adidas' Three-Stripe Mark and Superstar Trade Dress have
acquired secondary meaning, this factor weighs in favor of adidas.

### e. Defendant's Intent

Though a showing of "intent to confuse consumers is not required for a finding of
trademark infringement," Brookfield, 174 F.3d at 1059, adidas has submitted sufficient evidence
of Payless' intent to imitate the Three-Stripe Mark to create a genuine issue of material fact as to
likelihood of confusion.  See Academy of Motion Picture Arts & Scis., 944 F.2d at 1456 ("When
one party knowingly adopts a mark similar to another's, reviewing courts presume that the
defendant will accomplish its purpose, and that the public will be deceived."); Official Airline
Guides, Inc., 6 F.3d at 1394 ("When an alleged infringer knowingly adopts a mark similar to
another's courts will presume an intent to deceive the public.").

Here, there is no dispute that Payless was aware of the Three-Stripe Mark when it began
selling the accused footwear.  Horace Decl. Ex. A; Silverman Dep. 63:9-65:1; Prokop Dep.
29:14-31:7, 87:9-89:3.  Payless also acknowledges monitoring the trademark portfolios and
enforcement activities of branded footwear companies, including adidas.  Knops Dep. at 119:16-
25, 174:14-175:17, 182:6-184:23.  This is credible and admissible evidence of Payless'

knowledge of adidas' Three-Stripe Mark and its enforcement efforts.

In addition, there is substantial circumstantial and direct evidence that Payless intentionally copied adidas' mark.  For example, Payless' employees repeatedly referred to their shoes by the name of the corresponding adidas model (such as the Country Ripple or Samoa), or simply as "adidas" shoes.  <u>See</u> Feldman Decl., Ex. 23 ("Mark has the 2G [which is an adidas model] coming"); <u>id</u>. Ex. 26 ("2 versions of the 4 stripe Oxford (Adidas) [sic]"); <u>id</u>. Ex. 31 ("these orders are for the country ripple jogger"); <u>id</u>. Ex. 55 ("samoa has already been purchased"); <u>id</u>. Ex. 61 ("on the adidas 4-Stripe TAM16701 the factory has confirmed as follows: Mens 60m pairs 11/30-12/7 Boys 90m pairs 11/30-12/7").  Payless buyers also acknowledge "knocking off" or "interpreting" adidas styles.  <u>Id</u>., Ex. 44 ("we need more Nike & adidas 'running' knock-offs"); <u>id</u>. Ex. 76 ("an adidas look a like 4-stripe"); <u>id</u>. Ex. 30 ("Adidas [sic] inspired 4-stripe look a top seller"); <u>id</u>. Ex. 59 ("we did a good job of . . . interpreting adidas this Spring"); <u>id</u>. Ex.60 ("What are the current inspirations for these styles? . . . adidas 'clima cool.'").

Given the substantial similarity of the parties' respective products, the evidence of Payless' knowing imitation of adidas' mark raises substantial issues of material fact as to Payless' intent.  Furthermore, as discussed <u>supra</u> Section III.B.3, there are substantial issues of material fact as to whether advice of counsel obtained by Payless was competent and whether Payless' purported reliance on such advice was reasonable.  As such, the court cannot conclude that any infringement was non-willful as a matter of law.  This factor weighs against granting summary judgment in Payless' favor on the issue of infringement.

<u>f.  Actual Confusion</u>

As an initial matter, adidas acknowledges that there is no likelihood of consumer confusion at the point-of-sale. Rather, adidas' infringement claims are based on the likelihood of initial-interest and post-sale confusion. Payless argues that both of those theories fail in this context. I disagree.

Contrary to the court needing to "buy into" adidas' initial interest and post-sale confusion theories, see Payless Mem. in Supp. of Summ. J., at 3, "[t]he Ninth Circuit has explicitly recognized that the use of another's trademark in a manner calculated 'to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion, may still be an infringement.'" adidas v. Target, 228 F. Supp. 2d at 1211 (quoting Dr. Seuss, 109 F.3d at 1405). Similarly, "the law in the Ninth Circuit is clear that 'post-purchase confusion,' i.e., confusion on the part of someone other than the purchaser who, for example, simply sees the item after its has been purchased can establish the required likelihood of confusion under the Lanham Act." Karl Storz, 285 F.3d at 854.

Moreover, this court has specifically endorsed the use of both initial-interest and post-sale confusion in factually identical cases involving two- and four-stripe footwear that allegedly infringed adidas' Three-Stripe Mark. adidas v. Target, 228 F. Supp. 2d at 1211; ACI v. adidas, 359 F. Supp. 2d at 921. I agree with the rationale and conclusions in those cases. Initial-interest and post-sale confusion are well established forms of confusion in this context, and adidas' failure to allege point-of-sale confusion is of no consequence. See ACI v. adidas, 359 F. Supp. 2d at 921 ("Post-sale confusion . . . may be no less injurious to the trademark owner's reputation than confusion on the part of the purchaser at the time of sale.") (quoting Karl Storz, 285 F.3d at 854)); Brookfield, 174 F.3d at 1062 (finding initial-interest confusion in the absence of point-of-

PAGE 35 - REDACTED OPINION AND ORDER

sale confusion); <u>Levi Strauss</u>, 632 F.2d at 822 (rejecting defendant's attempt to limit the

confusion analysis to point-of-sale circumstances); <u>see also</u> <u>Academy of Motion Picture Arts &</u>

<u>Scis.</u>, 944 F.2d at 1455; <u>Payless v. Reebok</u>, 998 F.2d at 989-90 (both reversing trial court for

failure to consider post-sale confusion).

adidas has submitted credible evidence of actual harm resulting from the alleged initial-

interest and post-sale confusion to create a genuine issue of material fact as to the likelihood of

confusion.  Payless directly benefits from initial interest confusion by receiving unearned

consumer interest.  Pham Decl., Ex. 1 ¶¶ 88, 90; <u>cf.</u> <u>Dr. Seuss</u>, 1090 F.3d at 1405 (Initial interest

confusion allows the infringer to improperly benefit from the goodwill that has developed in the

mark).  In addition, consumers are likely to impute to Payless many of the positive traits

associated with the adidas brand due to years of extensive advertising of the Three-Stripe Mark.

<u>Id</u>. ¶ 96.  Payless also receives sales from buyers aiming to acquire the prestige of the adidas

brand at a cheaper price.  This is credible evidence of harm flowing from consumer confusion.

<u>McCarthy</u> § 23:7; <u>Hermes Int'l v. Lederer de Paris Fifth Ave., Inc</u>., 219 F.3d 104, 108 (2d Cir.

2000) ("[P]ost-sale confusion can occur when a manufacturer of knockoff goods offers

consumers a cheap knockoff copy of the original manufacturer's more expensive product, thus

allowing a buyer to acquire the prestige of owning what appears to be the more expensive

product.").

Furthermore, adidas has submitted evidence that Payless' stripe designs negatively impact

consumer perceptions of the adidas brand as a source of quality footwear.  Joachimsthaler Decl.,

Ex. 1 ¶ 112.  adidas' expert, Dr. Joachimsthaler noted that "the presence of the knockoff Payless

shoes in the mass market may cause adidas to appear overexposed and thereby lose its premium

PAGE 36 - REDACTED OPINION AND ORDER

perception . . . ."  Id., Ex. 1 ¶ 105.  Indeed, consumers who view Payless' shoes in the post-sale

context "may attribute any perceived inferior quality of Payless shoes to [adidas]."  <u>Payless v.</u>

<u>Reebok</u>, 998 F.2d at 989.  Here, there is evidence that Payless shoes are actually inferior to

adidas' shoes in quality.  Teston Dep. at 163:20-23, 165:22-24.  Perhaps more importantly, there

is evidence that consumers actually perceive Payless' shoes to be of inferior quality.

Joachimsthaler Decl., Ex. 1 ¶ 101; Feldman Decl. Ex. 49 at 18 ("[M]any [consumers]

commented that the overall quality of the shoes wasn't great.").  Indeed, Payless is aware of the

perception among consumers that its shoes are low quality.  Wells Dep. at 85:2-8, 141:22-143:8.

This is credible evidence of harm to adidas because "[o]ne of the most valuable and important

protections afforded by the Lanham Act is the right to control the quality of the goods

manufactured and sold under the holder's trademark."  <u>El Greco Leather Prods. Co., Inc. v. Shoe</u>

<u>World, Inc.</u>, 806 F.2d 392, 395 (2d Cir. 1986).  Finally, there is evidence that Payless' shoes are

likely to have a negative effect on adidas' customer loyalty.  Joachimsthaler Decl., Ex. 1 ¶¶ 106-

08.  In sum, adidas has submitted sufficient evidence of actual harm to create a genuine issue of

material fact as to initial-interest and post-sale confusion.

    Finally, adidas has also submitted evidence of actual confusion in the form of survey

evidence, which shows that two and four stripe footwear creates a likelihood of confusion among

consumers "who within the next six months were likely to purchase a pair of athletic shoes."

Ford Decl. ¶ 16. Each of the surveys were performed using the same methodology, and a

substantial portion of <u>prospective</u> purchasers (41%) <u>actually believed</u> that Payless' four-stripe

shoe was made or authorized by adidas.  Ford. Decl. ¶¶ 19, 24.  Such a finding is sufficient to

support a finding of actual confusion.  <u>Thane Int'l</u>, 305 F.3d at 903 (finding more than 25%

PAGE 37 - REDACTED OPINION AND ORDER

consumer confusion sufficient); Exxon Corp., 628 F2d at 507 (15% confusion sufficient); James

Burroughs Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 279 (7th Cir. 1976) (15%); Re/Max Int'l

Inc. v. Help-U-Sel Inc., 20 U.S.P.Q. 2d 1945, 1946-47 (C.D. Cal. 1991) (trade dress

infringement survey showing 28% affiliation response "constitutes strong evidence" of

likelihood of confusion); Mut. of Omaha Ins., Co. v. Novak, 836 F.2d 397, 400-01 (8th Cir.

1987) (10-12% confusion entitled to "significant weight").  Contrary to Payless' argument,

consumer surveys have generally been accepted as proxies for actual confusion.  McCarthy §

32:184 ("Several courts . . . have put survey evidence under the heading of 'actual confusion.'").

As discussed supra, Section III.A, Payless' objection to Dr. Ford's survey methodology go to the

weight of the evidence, rather than its admissibility.

      Given adidas' showing of actual consumer confusion, and the evidence of harm to adidas

resulting from initial-interest and post-sale confusion, I find there are significant issues of

material fact as to actual confusion.  Accordingly, this factor weighs against granting Payless

summary judgment on the issue of infringement.

### g.  Degree of Care Exercised by the Average Purchaser

      "In assessing the likelihood of confusion to the public, the standard used by the courts is

the typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353.  Where goods are

expensive, or purchased after careful consideration, it is less likely that a reasonably prudent

buyer would be confused as to the source of the goods.  Pignons S.A. de Mecanique de Precision

v. Polaroid Corp., 657 F.2d 482, 489 (1st Cir. 1981); see also Sleekcraft, 599 F.2d at 353

("[W]hen the goods are expensive the buyer can be expected to exercise greater care in his

purchases; again, though, confusion may still be likely."); McCarthy § 23:96 ("The reasonably

PAGE 38 - REDACTED OPINION AND ORDER

prudent buyer is assumed to take more care in purchasing 'expensive' items which he buys infrequently, than in buying everyday, relatively inexpensive items.").

Courts have found that purchasers of "relatively inexpensive athletic and sportswear" are "not likely to exercise a great deal of care in distinguishing between trademarks when purchasing the goods.  M'Otto Enters., Inc. v. Redsand, Inc., 831 F. Supp. 1491, 1502 (W.D. Wash. 1993); see also Gucci Am., Inc. v. Action Activewear, Inc., 759 F. Supp. 1060, 1066 (S.D.N.Y. 1991) ("[T]he court has no reason to conclude that the buyer of casual sportswear represent a particularly sophisticated group of customers.").  Moreover, Payless' counsel acknowledges that Payless' consumers are "not particularly sophisticated."  Knops Dep. at 104:6-16.  Relatively unsophisticated value-conscious customers are more likely to be attracted to, and confused by imitations of adidas' Three-Stripe Mark.  This factor tips in favor of adidas.

### h.  Likelihood of Expansion into Other Markets

The parties agree that this factor is not relevant in this case.

### 3. Conclusion

Having considered the Sleekcraft factors, I find adidas has produced substantial evidence of the likelihood of confusion between the Three-Stripe Mark and Payless' use of two or four stripes on footwear.  There are significant issues of material fact as to several of the Sleekcraft confusion factors.  Many of these issues will turn on questions of credibility and intent.  As such, Payless' motion for summary judgment on adidas' infringement claims is denied.

### D. Payless' Motion for Partial Summary Judgment Dismissing Plaintiffs' Federal and State Dilution Claims

### 1. Federal Dilution Standards

PAGE 39 - REDACTED OPINION AND ORDER

The point of federal dilution law is to protect the owner's investment in his mark.  Nissan Motor Co. v. Nissan Computer Corp., 378 F.3d 1002, 1012 (9th Cir. 2004).  "Dilution . . . is 'the lessening of the capacity of a famous mark to identify and distinguish goods or services' of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another."  Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007) (quoting 15 U.S.C. § 1127).  It is a cause of action "invented and reserved for a select class of marks—those marks with such powerful consumer associations that even non-competing uses can impinge on their value."  Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999) (citation omitted).  For this reason, the FTDA applies "only to those marks which are both truly distinctive and famous, and therefore most likely to be adversely affected by dilution."  Id. at 876.

Prior to October 6, 2006, the Federal Trademark Dilution Act ("FTDA") entitled the owner of a famous mark to injunctive relief where "another person's commercial use . . . of a mark or trade name . . . causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1) (effective until October 5, 2006) (emphasis added).  The statute further provided that the owner of a famous mark "shall be entitled only to injunctive relief . . . unless the person against whom the injunction is sought wilfully intended to trade on the owner's reputation or to cause dilution of the famous mark.  If such willful intent is proven, the owner of the famous mark shall also be entitled to the [monetary] remedies set forth in section[] 1117(a) . . . ."  Id. § 1125(c)(2) (effective until October 5, 2006).  The FTDA "unambiguously require[d] a showing of actual dilution, rather than a likelihood of dilution." Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433 (2003).  Thus, to obtain money damages for dilution under the FTDA, a plaintiff

PAGE 40 - REDACTED OPINION AND ORDER

must show: (1) its mark is famous; (2) the defendant is making commercial use of the famous

mark; (3) the defendant's use began after the plaintiff's mark became famous; (4) the defendant's

use <u>actually diluted</u> the quality of the mark by diminishing the capacity of the mark to identify

and distinguish goods and services; and (5) the defendant willfully intended to trade on the

trademark owner's reputation or to cause dilution. 15 U.S.C. § 1125; <u>Horphag Research</u>, 475

F.3d at 1036 (citing <u>Moseley</u>, 537 U.S. at 433); <u>Avrey Dennison</u>, 189 F.3d at 873-74.  In

addition, "the mark used by the alleged diluter must be identical, or nearly identical, to the

protected mark." <u>Thane Int'l., Inc. v. Trek Bicycle Corp.</u>, 305 F.3d 894, 905 (9th Cir. 2002).

On October 6, 2006, Congress enacted the Trademark Dilution Revision Act of 2006

("TDRA"), which amended the FTDA.[11]  Under the TDRA, "the owner of a famous mark . . .

shall be entitled to an injunction against another person who, at any time after the owner's mark

has become famous, commences use of a mark or trade name in commerce that is <u>likely to cause</u>

<u>dilution</u> by blurring or dilution by tarnishment of the famous mark, regardless of the presence or

absence of actual or likely confusion, of competition, or of actual economic injury.″  15 U.S.C. §

1125(c)(1) (emphasis added).  Thus, the TDRA replaced the FTDA's "actual dilution" standard

with a "likelihood of dilution" standard.  The TDRA did not, however, eliminate the requirement

that the alleged diluter's mark be identical, nearly identical, or substantially similar.  <u>Century 21</u>

<u>Real Estate, LLC v. Century Ins. Group</u>, No. 03-0053-PHX-SMM, 2007 WL 484555, at *14 (D.

---

[11] Specific changes to federal dilution law under the TDRA include: (1) the establishment of a "likelihood of dilution" standard for dilution claims, rather than an "actual dilution" standard; (2) a provision that non-inherently distinctive marks may qualify for protection; (3) a reconfiguration of the factors used to determine whether a mark is famous for dilution purposes, including a rejection of dilution claims based on "niche" fame; and (4) the specification of separate and explicit causes of action for dilution by blurring and dilution by tarnishment; and (5) an expanded set of exclusions.  <u>See</u> 15 U.S.C. § 1125(c).

Ariz. Feb. 9, 2007).

With respect to adidas' federal dilution claims, the parties agree that (1) the TDRA's relaxed "likelihood of dilution" standard applies retroactively to adidas' claims for injunctive relief, while (2) the FTDA governs adidas' claims for monetary damages because Payless' allegedly unlawful actions began before the enactment of the TDRA.  See 15 U.S.C. § 1125(c)(5) ("The owner of the famous mark shall also be entitled to [monetary damages] . . . [if] the mark or trade name that is likely to cause dilution . . . was *first used* in commerce by the [defendant] *after October 6, 2006*.") (emphasis added); see also Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 477 F.3d 765, 766 (2d Cir. 2007) (applying the TDRA's "likelihood of dilution" standard retroactively to the plaintiff's claims for injunctive relief); Malletier v. Dooney & Bourke, Inc., No. 04 Civ. 2990(SAS), 2007 WL 1222589, at *3 (S.D.N.Y. April 24, 2007) ("The second sentence of subsection 1125(c)(5), entitling owners of famous marks to dilution damages, contains an unambiguous date restriction that authorizes the application of the "likelihood of dilution" standard as a basis for recovering damages to civil actions where the diluting mark or trade name was first introduced in commerce after October 6, 2006.") (emphasis in original); Dan-Foam and Tempur-Pedic, Inc. v. Brand Named Beds, LLC, No. 06 Civ. 6350(SAS), 2007 WL 1346609, at *7 (S.D.N.Y. May 4, 2007) ("[T]he TDRA's relaxed likelihood of dilution standard applies only to pre-October 6, 2006 claims seeking prospective relief, actual dilution under Moseley still applies when a pre-October 6, 2006 claimant seeks monetary relief.").

### 2. Payless Challenges

Payless argues that adidas has failed to establish that (1) Payless' use of two and four

PAGE 42 - REDACTED OPINION AND ORDER

stripe designs has caused underline actual dilution of the Three-Stripe mark, and (2) Payless wilfully

intended to trade on adidas' reputation, each of which is required to recover monetary damages

under FTDA.  In addition, Payless contends adidas cannot demonstrate any likelihood of dilution

under the TDRA.  Finally, Payless argues that adidas' claims under both the FTDA and TDRA

must be dismissed because adidas has failed to demonstrate that (1) Payless' designs are identical

or nearly identical to adidas' trademark, and (2) the Three-Stripe Mark is "widely recognized by

the consuming public."  I disagree.

                    a. Famousness of the Mark

        To prevail on its dilution claims under either the FTDA or the TDRA, adidas must

establish that the Three-Stripe mark is "famous."  15 U.S.C. § 1125; see also Avery Dennison,

189 F.3d at 876 ("[T]he [FTDA] . . . appl[ies] only to those marks which are both truly

distinctive and famous, and therefore most likely to be adversely affected by dilution.") (internal

quotations omitted; emphasis in original).  Under the FTDA, fame is interpreted very narrowly.

Thane Int'l., 305 F.3d at 907.  Similarly, the TDRA specifically requires that the mark be "widely

recognized by the general consuming public of the United States as a designation of source of

the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  Thus, to demonstrate

"famousness" under either the FTDA or the TDRA, adidas must show that the mark is "truly

prominent and renowned."  Avery Dennison, 189 F.3d at 875.  In addition to proving the mark is

famous, adidas must also establish that Payless' commercial use of the Three-Stripe Mark began

after the mark became famous.  Horphag Research, 475 F.3d at 1036.

        The FTDA and the TDRA each outline several non-exclusive factors the court may

consider in determining whether a mark is famous.  Under the TDRA, "the court may consider

PAGE 43 - REDACTED OPINION AND ORDER

all relevant factors," including: (1) "[t]he duration, extent, and geographic reach of advertising

and publicity of the mark, whether advertised or publicized by the owner or third parties"; (2)

"[t]he amount, volume, and geographic extent of sales of goods or services offered under the

mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) whether the mark is

registered.  15 U.S.C. § 1125(c)(2)(A).  The FTDA outlines a similar set of factors, "such as, but

not limited to":

> (A) the degree of inherent or acquired distinctiveness of the mark;
>
> (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;
>
> (C) the duration and extent of advertising and publicity of the mark;
>
> (D) the geographical extent of the trading area in which the mark is used;
>
> (E) the channels of trade for the goods or services with which the mark is used;
>
> (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;
>
> (G) the nature and extent of use of the same or similar marks by third parties; and
>
> (H) whether the mark was registered . . . on the principal register.

15 U.S.C. § 1125(c)(1)(A)-(H) (effective until Oct. 5, 2006).

Under either set of factors, the record supports a finding that adidas' Three-Stripe Mark is

famous, and has been famous since as early as 1970.  Indeed, this court has already recognized

as much in two separate, but factually identical cases.  See adidas-America, Inc. v. KMart Corp.,

No. CV-05-120-ST, 2006 WL 2044857, at *12 (D. Or. June 15, 2006) ("[B]y the early 1970s, the

Three-Stripe Mark and the Superstar shoe were well-known and famous"); adidas v. Target, 228

F. Supp. 2d at 1216 (finding adidas' extensive use of the Three Stripe Mark in connection with

its athletic footwear since 1952, its "huge" expenditures in advertising, promoting and

developing its brand identity, and its wide recognition in the athletic apparel industry to be

sufficient evidence to withstand summary judgment on the issue of fame).  After careful review

of the record, I agree with this court's previous findings on the issue of fame.[12]

        <u>b. Identity of the Marks</u>

For a dilution claim to succeed under either the FTDA or the TDRA, "the mark used by

the alleged diluter must be identical, or nearly identical, to the protected mark." <u>Thane Int'l.</u>, 305

F.3d at 905; <u>see</u> <u>also</u> <u>Century 21 Real Estate</u>, 2007 WL 484555, at *14 ("Although the TDRA no

longer requires actual dilution, the new law does not eliminate the requirement that the mark

used by the alleged diluter be identical, nearly identical, or substantially similar to the protected

mark.").  "For marks to be nearly identical to one another, they must be similar enough that a

significant segment of the target group of customers sees the two marks as essentially the same."

<u>Thane Int'l</u>, 305 F.3d at 906 (internal quotations omitted).  In the dilution context, the "similarity

of the marks" test is more stringent than in the infringement context.  <u>Id</u>. at 905.

In determining whether Payless' designs are identical or nearly identical to adidas' marks,

the Ninth Circuit's discussion of identity in <u>Thane International, Inc. v. Trek Bicycle Corp.</u>, 305

F.3d 894, 905-07 (9th Cir. 2002), is instructive.  In that case, a bicycle manufacturer alleged that

an exercise machine manufacturer's use of the name "OrbiTrek" diluted the "TREK" trademark.

In discussing whether the marks were "identical or nearly identical,"  the Ninth Circuit noted that

---

[12]Given the extensive evidence adidas submitted as to each of the statutory "fame"
factors, its failure to conduct a fame survey is not dispositive.  <u>Cf</u>. <u>Google Inc. v. Am. Blind &
Wallpaper</u>, No. C 03-5340 JFR, 2007 WL 1159950, at *11 (N.D. Cal. Apr. 18, 2007)
(unpublished decision) (failure to conduct survey was not dispositive on the question of fame
where plaintiff submitted evidence of fame in the form of declarations, trademark registration,
and extensive sales and advertising); <u>see</u> <u>also</u> <u>800-JR Cigar, Inc. v. Goto.com</u>, 437 F. Supp. 2d
273, 294 (D. N.J. 2006) (finding mark famous based on trademark registration, sales, and third-
party recognition without requiring fame survey).

PAGE 45 - REDACTED OPINION AND ORDER

to state a claim for dilution, the plaintiff "must show that . . . 'the defendant is making commercial use of *the* mark . . . .'" Id. at 905 (quoting Avery Dennison, 189 F.3d at 874) (emphasis in original).  The Ninth Circuit explained that "a dilution claim alleges a form of appropriation," which "implies the adoption of the mark itself." Id. at 906.  Although the "OrbiTrek" and "TREK" marks were not identical, a fact-finder could reasonably conclude that the marks were nearly identical because the "OrbiTrek mark contain[ed] the entire TREK mark." Id. at 907.    That the OrbiTrek mark added four letters to the word TREK did not entitle the alleged diluter to summary judgment on the issue of identity because "[a] reasonable trier of fact could determine that [the OrbiTrek manufacturer] 'use [d]' the TREK mark by incorporating the *same* word into its own mark as a separate, visually identifiable element, and that a significant segment of the consuming public would likely focus on that element as an identifier essentially the same as the TREK mark." Id. at 907 (emphasis added).

Although Payless' four-stripe designs are not identical to adidas' Three-Stripe Mark, a reasonable fact-finder could conclude that the marks are "nearly identical" or "essentially the same."   Like the nearly identical OrbiTrek and TREK marks in Thane International, Payless' four-stripe design actually contains the entire Three-Stripe Mark and simply adds another identical, parallel stripe.  If Payless were to remove the fourth stripe, its stripe design would be virtually indistinguishable from adidas' mark in angularity, placement, size, and equidistance.  Payless cannot appropriate the Three-Stripe Mark and avoid liability for dilution simply by adding or subtracting a single, identical stripe.  See Thane Int'l., 305 F.3d at 907 (TREK and OrbiTrek are similar enough to present a jury question as to whether they are nearly identical); see also Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 466 n.4 (7th Cir. 2000)

(HERBROZAC sufficiently similar to PROZAC to prove dilution). As in <u>Thane International</u>, a reasonable trier of fact could determine that Payless "used" or "appropriated" adidas' Three-Stripe Mark and "incorporat[ed] the <u>same</u> [symbol] into its own mark as a separate, visually identifiable element, and that a significant segment of the consuming public would likely focus on that element as an identifier essentially the same as the [adidas] mark." <u>Id</u>. (emphasis added).

Furthermore, adidas has submitted evidence that a "substantial segment of the consuming public" actually believes that Payless' four-stripe designs are "essentially the same" as adidas' Three-Stripe Mark.  Forty-one percent of respondents in one survey saw a four-stripe design and believed it was adidas' mark.  Ford Decl. ¶¶ 2, 20, 24-25, 30-31, 41, 45-46, 50, 53, 57-58.  In addition, adidas' expert stated Payless' two- and four-stripe shoes "feature a number of design elements that call to mind various classic adidas shoes . . . includ[ing] the angularity, positioning, parallel, and equidistant nature of the stripes on a number of Payless models that mimic adidas' iconic Three-Stripe symbol, the perforations alongside the stripes on specific Payless models that imitate their original adidas counterparts, and specific design elements of the adidas models . . . such as the shell toe, flat sole, and heel patch of the adidas Superstar model."  Joachimsthaler Decl., Ex. 1 ¶ 78.  The distinct similarities between the parties stripe designs will cause consumers to make a mental association between the two products.  Pham Decl., Ex. 1 ¶¶ 67-78, 87-100; <u>see also</u> <u>McCarthy</u> § 24:117 ("The more similar the marks, the more likely it is that the required public 'association' is proven," and consequently, the more likely dilution by blurring may be proven.).  As this court has noted in substantially similar factual circumstances, such survey evidence and expert opinion may be "open to attack, [but] it is at least sufficient to create

a genuine issue of material fact to preclude summary judgment [on the issue of identity]." adidas v. KMart, 2006 WL 2044857, at * 12-13; see also ACI v. adidas, 359 F. Supp. 2d at 923 ("adidas has submitted sufficient evidence to support the requisite elements that the two-stripe design is identical or nearly identical to its Mark.").

Whether the marks at issue are nearly identical is a context-specific and fact-intensive inquiry. Savin Corp. v. Savin Group, 391 F.3d 439, 453 (2d Cir. 2004). Given the similarity of Payless' stripe designs and adidas' Three-Stripe Mark, and adidas' evidence that consumers actually view the marks as "essentially the same," a fact-finder could reasonably conclude that Payless' stripe designs and adidas' Three-Stripe Mark are, in fact, nearly identical. As such, summary judgment is not appropriate on the issue of identity.

c. Actual Dilution

As noted, because Payless' allegedly unlawful actions began before the effective date of the TDRA, adidas must show that Payless' alleged use of stripes actually dilutes the adidas' Three-Stripe Mark to recover money damages under the FTDA. Starbucks, 477 F.3d at 766; Dan-Foam, 2007 WL 1346609, at *7.

Dilution is the "lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." Moseley, 537 U.S. at 433 (citing 15 U.S.C. § 1117). Actual dilution occurs "by either a blurring of the mark's identification or a tarnishment of the positive associations the mark has come to convey." See Moseley, 537 U.S. at 433 (The purpose of the FTDA "is to protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage

PAGE 48 - REDACTED OPINION AND ORDER

it.").  Actual dilution "does <u>not</u> mean that the consequences of dilution, such as an actual loss of

sales or profits, must also be proved."  <u>Id</u>. (emphasis added).  In <u>Moseley</u>, the Supreme Court

noted, "[i]t may well be . . . that direct evidence of dilution such as consumer surveys will not be

necessary if actual dilution can be reliably proved through circumstantial evidence—the obvious

case is one where the junior and senior marks are identical."  <u>Id</u>.  On the other hand, "where the

marks at issue are not identical, the mere fact that consumers mentally associate the junior user's

mark with a famous mark is not sufficient to establish actionable dilution."  <u>Id</u>.

Payless argues that adidas cannot demonstrate actual dilution under the FTDA because

the opinion testimony and circumstantial evidence adidas relies on as proof of dilution is

insufficient as a matter of law.  I disagree.  In a factually identical case involving alleged dilution

of the Three-Stripe Mark, Magistrate Judge Stewart considered and rejected the exact argument

Payless now proffers:

> Defendants assert adidas cannot demonstrate actual dilution.  In response, adidas
> has submitted an expert opinion identifying numerous ways in which defendants'
> continued sale of two and four stripe footwear dilutes the distinctiveness of the
> Three-Stripe Mark by:
>
> (1) reducing brand equity within the footwear market; (2) negatively affecting the
> strength of the mark in the minds of consumers; (3) eviscerating the perception of
> the mark as signifying quality and a premium product; and (4) impacting
> consumer loyalty associated with the mark. Joachimsthaler Report, . . .; see also
> Pham report, . . . .  This evidence is sufficient to create a genuine issue of material
> fact both as to actual dilution under the FTDA, . . . and as to the likelihood of
> dilution . . . .

<u>adidas v. KMart</u>, 2006 WL 2044857, at *12.  Here, adidas relies on the <u>same</u> evidence that this

court previously found sufficient to withstand summary judgment on the issue of actual dilution,

and Payless makes no attempt to distinguish the facts of this case from <u>adidas v. KMart</u>.

Accordingly, I find no compelling reason to depart from Magistrate Judge Stewart's analysis and

PAGE 49 - REDACTED OPINION AND ORDER

conclusion that such evidence is sufficient to create an issue of fact as to actual dilution under the FTDA.

Given Judge Stewart's previous rulings on this exact issue and the substantial similarity between the marks at issue, I find adidas has submitted sufficient evidence to create a genuine issue of material fact as to actual dilution under the FTDA.  Because adidas has proffered sufficient evidence to demonstrate actual dilution, it has necessarily satisfied the lesser standard of likelihood of dilution under the TDRA.

### d. Willful Intent

To recover monetary damages for dilution under the FTDA, a plaintiff must show that the defendant "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark."  See 15 U.S.C. § 1125(c)(2) (The owner of a famous mark "shall be entitled only to injunctive relief . . . unless the [defendant] willfully intended to trade on the owner's reputation or to cause dilution of the famous mark.  If such willful intent is proven, the owner of the famous mark shall also be entitled to the [monetary] remedies set forth in section[] 1117(a) . . . .") (effective until October 5, 2006).

As discussed at length supra, Sections III.B and III.C.2.e, adidas has submitted sufficient direct and circumstantial evidence to raise genuine issues of material fact as to Payless' intent in using two- or four-parallel, equidistant stripes running diagonally from the mid-sole forward to the laces.  Based on that evidence, a fact-finder could reasonably conclude that Payless did, in fact, intend to "trade on [adidas'] reputation" by creating an association between its footwear and adidas' Three-Stripe Mark.  15 U.S.C. § 1125(c).

### 3. Oregon State Law Dilution

adidas has also asserted a claim under Oregon's anti-dilution statute, Or. Rev. Stat.

§ 647.107.  Oregon's dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a [registered] mark . . . or a mark valid at common law, or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

Or. Rev. Stat. § 647.104.[13]  Payless, however, argues that adidas' state law trade dress dilution

claims are preempted by federal patent law.  Payless contends the Oregon dilution law

substantially interferes with federal patent law because it effectively extends "patent-like

protection" to an unpatented, yet patentable product design (*i.e.*, the Superstar Trade Dress).  I

agree.

In Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989), the Supreme

Court held that "state regulation of intellectual property must yield to the extent that it clashes

with the balance struck by Congress in our patent laws." Id. at 154.  In so holding, the Court

explained:

> The federal patent system . . . embodies a carefully crafted bargain for encouraging the creation and disclosure of new, useful, and nonobvious advances in technology and design in return for the exclusive right to practice the invention for a period of years. '[The inventor] may keep his invention secret and reap its fruits indefinitely. In consideration of its disclosure and the consequent benefit to the community, the patent is granted. An exclusive enjoyment is guaranteed him for seventeen years, but upon expiration of that period, the knowledge of the invention inures to the people, who are thus enabled without restriction to practice it and profit by its use.'
>
> The attractiveness of such a bargain, and its effectiveness in inducing creative

---

[13]adidas alleges dilution of the Superstar Trade Dress under the anti-dilution laws of 36 states.  The parties agree that each of the state dilution laws are substantively identical to Oregon's anti-dilution law.

effort and disclosure of the results of that effort, depend almost entirely on a
backdrop of free competition in the exploitation of unpatented designs and
innovations. The novelty and nonobviousness requirements of patentability
embody a congressional understanding, implicit in the Patent Clause itself, that
free exploitation of ideas will be the rule, to which the protection of a federal
patent is the exception. Moreover, the ultimate goal of the patent system is to
bring new designs and technologies into the public domain through disclosure.
State law protection for techniques and designs whose disclosure has already been
induced by market rewards may conflict with the very purpose of the patent laws
by decreasing the range of ideas available as the building blocks of further
innovation. The offer of federal protection from competitive exploitation of
intellectual property would be rendered meaningless in a world where
substantially similar state law protections were readily available. To a limited
extent, the federal patent laws must determine not only what is protected, but also
what is free for all to use.

Id. at 150-51 (citations omitted; emphasis added). In Bonito Boats, the Court concluded that a

state statute, which prohibited using any direct molding process to duplicate a boat hull, granted

boat manufacturers "patent-like protection for ideas deemed unprotected under the present

federal scheme," and therefore conflicted with, and was preempted by federal patent law. Id. at

168. The state law "substantially restricted the public's ability to exploit an unpatented design in

general circulation, raising the specter of state-created monopolies in a host of useful shapes and

processes for which patent protection has been denied or is otherwise unobtainable." Id. at 167.

     The Court did not, however, prohibit all state regulation of potentially patentable designs.

States "may protect businesses in the use of their trademarks, labels, or distinctive trade dress in

the packaging of goods so as to prevent others, by imitating such markings, from misleading

purchasers as to the source of the goods." Id. at 154. Similarly, a state may protect trade secrets,

or forbid industrial espionage without conflicting with federal patent law. Id. at 155. The Court

indicated that limited state regulations of patentable designs may be permissible if the

regulations are "not aimed exclusively at the promotion of the invention itself and . . . limited to

PAGE 52 - REDACTED OPINION AND ORDER

those necessary to promote goals outside the contemplation of the federal patent scheme." Id. at 166.

Relying Bonito Boats, federal courts have held that state anti-dilution statutes are preempted by federal patent law where the state law effectively prohibits the copying of a patentable, yet unpatented product design, without any requirement of consumer confusion. Escada AG v. The Limited, Inc., 810 F. Supp. 571, 574 (S.D.N.Y. 1993); Eastern Am. Trio Prods., Inc. v. Tang Electronic Corp., 97 F. Supp. 2d 395, 424 n. 199 (S.D.N.Y. 2000). In both Escada and Eastern, the court determined that New York's anti-dilution law, which is substantively identical to the Oregon anti-dilution law, was preempted by federal patent law because the plaintiff sought to use the statute to "enjoin defendants from making, using or selling [product] designs which allegedly mimic[ked]" the plaintiff's unpatented trade dress. "Were the statute to be so applied, a would-be inventor . . . would not have to meet the rigorous standards for obtaining a patent and his right to exclude copiers would not be confined to a design patent's 14 year limit." Escada, 810 F. Supp. at 574; see also Eastern, 97 F. Supp. 2d 424 n.199. Since the New York dilution law did not require a finding of consumer confusion, the New York anti-dilution law went beyond the limited state regulation allowed by Bonito Boats.

Like the preempted state anti-dilution law at issue in Escada and Eastern, Oregon's dilution law would interfere with federal patent law by allowing adidas to forever exclude others from making and selling an unpatented product design without requiring adidas to meet the rigorous standards for obtaining a federal patent. In effect, the Oregon anti-dilution statute would provide perpetual "patent-like protection for an intellectual creation that would otherwise remain unprotected as a matter of law." Bonito Boats, 489 U.S. at 168. Notably, the Oregon

PAGE 53 - REDACTED OPINION AND ORDER

anti-dilution is substantively indistinguishable from the New York anti-dilution law in <u>Escada</u>

and <u>Eastern</u>.[14]   Like the plaintiff in <u>Escada</u> and <u>Eastern</u>,  adidas seeks to prohibit Payless from

imitating a patentable design under a state law that does not require a finding of consumer

confusion.  Thus, as applied to potentially patentable trade dress designs, the state anti-dilution

statutes upon which adidas relies go beyond the limited state regulation allowed by <u>Bonito</u>

<u>Boats</u>.  "When the subject matter is potentially patentable the state interest in protecting the

manufacturer from dilution must yield to the national interest in uniform patent law." <u>Id</u>. at 154.

As such, adidas' state law dilution claims are preempted by federal patent law, and Payless'

motion for summary judgment dismissing adidas' Seventh Claim is granted.

### E. Payless' Affirmative Defenses and Counterclaims

Both parties move for summary judgment on Payless' affirmative defense of laches.  In

addition, adidas seeks summary judgment as to Payless' Second (waiver and equitable estoppel),

Third (contractual estoppel), Fourth (acquiescence), Fifth (lack of distinctiveness), Sixth

(functional), Seventh (unclean hands), Eighth (antitrust), Tenth (abandonment), Eleventh (failure

to perform), Twelfth (loss of secondary meaning), Thirteenth (generic) and Fourteenth (stripe

depletion) Affirmative Defenses, as well as all four of Payless' Counterclaims (breach of

contract, state unfair competition and deceptive trade practices, and abandonment of trademark).

Because many of Payless' affirmative defenses and counterclaims raise closely related legal

issues and rely on similar factual bases, the parties do not separately address each claim.

Accordingly, I will follow suit and group the defenses and counterclaims against which adidas

---

[14]adidas actually asserts a state law dilution claim under the same New York anti-dilution
state at issue in both <u>Escada</u> and <u>Eastern</u>.

moves into sections based on common factual and legal arguments.

### 1. Laches

Laches is a valid defense to Lanham Act claims for both monetary damages and injunctive relief.  Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 465 F.3d 1102, 1108 (9th Cir. 2006); see also Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 840 (9th Cir. 2002) ("As long as the defendant would 'be prejudiced by a prospective injunction,' a court may apply laches.").  The defense is premised on the  maxim that "one who seeks the help of a court of equity must not sleep on his rights."  Jarrow Formulas, 304 F.3d at 835.  It is a disfavored defense in trademark cases,  E.& J. Gallo Winery v. Pasatiempos Gallo, S.A., 905 F. Supp. 1403, 1414 (E.D. Cal. 1994), and available "only where the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time." Brookfield, 174 F.3d 1061 (9th Cir. 1999).  To prevail on a laches defense, a defendant must prove: (1) the claimant unreasonably delayed in filing suit; and (2) as a result of the delay, the defendant suffered prejudice.  Danjaq, 263 F.3d at 955.

### a. Unreasonable Delay

"A determination of whether a party exercised unreasonable delay in filing suit consists of two steps."  Jarrow Formulas, 304 F.3d at 838.  First, the court must assess the length of delay, which is measured from the time plaintiff knew, or in the exercise of reasonable diligence, should have known about its potential cause of action. Id.  Second, the court must consider whether plaintiff's delay was reasonable in light of the time allotted by the analogous state law limitations period.  Id. at 838-39.  Here, adidas' claims are governed by Oregon's two-year statute of limitations for fraud claims, Or. Rev. Stat. § 12.110.  See Johannsen v. Brown, 797 F. Supp.

PAGE 55 - REDACTED OPINION AND ORDER

835, 839-40 (D. Or. 1992) (citing Unlimited Screw Prods., Inc. v. Malm, 781 F. Supp. 1121,

1125 (E.D. Va. 1991)) ("The majority of federal courts to have considered this issue have

concluded that claims brought under section 43(a) of the Lanham Act are most comparable to

claims brought for fraud.").[15]  If adidas filed within the analogous two-year state law limitations

period for fraud, there is a strong presumption against finding unreasonable delay; if adidas filed

outside that period, the presumption is reversed. Jarrow Formulas, 304 F.3d at 837-38.

        In determining the start date of the laches period—that is, the date plaintiff knew or

should have known of defendant's potentially infringing conduct—the court must "focus on the

conduct upon which the claimant bases its infringement claim." Tillamook Country Smoker,

Inc. v. Tillamook County Creamery Ass'n, 311 F. Supp. 2d 1023, 1032 (D. Or. 2004), aff'd  465

F.3d 1102 (9th Cir. 2006); see also Danjaq, 263 F.3d at 955 ("[T]he relevant delay is the period

from when the plaintiff knew (or should have known) of the allegedly infringing conduct.").  To

prove that a plaintiff knew or should have known of the defendant's allegedly wrongful activity,

the defendant must "make a showing that it would have been inconceivable that [the plaintiff]

would have been unaware" of those activities.  Official Airline Guides, Inc. v. Churchfield

Publications, Inc., 756 F. Supp. 1393, 1404 (D. Or. 1990).

        Here, adidas alleges Payless' use of two and four parallel stripes on footwear infringes

adidas' Three-Stripe mark for athletic and casual footwear (i.e., three, parallel, and equidistant

stripes running diagonally from the mid-sole of the shoe forward to the shoelaces).  adidas also

alleges Payless is infringing its Superstar Trade Dress, which consists of the Three-Stripe mark,

_____

        [15]adidas neither cites, nor is the court aware of any authority to support its argument that
Oregon's ten-year statute of "ultimate repose" should govern its claims.

a rubber "shell toe," a particularly flat sole, and a colored portion on the outer back heel.  Thus, the question becomes whether it would have been "inconceivable" that adidas was unaware of Payless' potentially infringing imitations of adidas' Three-Stripe Mark and Superstar Trade Dress prior to November 1999 (*i.e.*, outside the analogous two-year limitations period for fraud).

On this record, there are disputed issues of fact as to when adidas knew or reasonably should have known of Payless' potentially infringing use of two- or four-parallel stripes.  adidas contends that it did not have actual knowledge that Payless was selling the footwear at issue until October 2001—approximately one month prior to adidas' initiation of this lawsuit.  adidas argues that the earliest it *could* have known of Payless' allegedly infringing conduct was 1998, when Payless started selling the specific shoes at issue.  But the focus of laches is the defendant's allegedly infringing "course of conduct," not the specific products that the plaintiff chooses to isolate for the purposes of litigation.  See Danjaq, 263 F.3d 953-54 (noting that it would be "incongruous" to allow plaintiff's infringement claim to proceed with respect to the re-release of a DVD despite dismissing "the same claim regarding the original work" on laches grounds).  Moreover, as noted in adidas America v. Kmart Corp, 2006 WL 2044857, at *7, "adidas'[] aggressive policing of its Three-Stripe Mark also casts doubt on adidas'[] professed ignorance of defendant's sales of two and four stripe shoes in the 1970s, 1980s, and 1990s."  In light of the fact that Payless is one of the nations' largest retailers of discount athletic and casual footwear, "it is difficult to reconcile [adidas'] own emphasis on its aggressive policing of its trademarks with its simultaneous claims of ignorance" of Payless' sale of two- and four striped footwear.  McDonald's Corp. v. Druck & Gener, DDS, P.C., 814 F. Supp.1127, 1137 (N.D.N.Y. 1993).

On the other hand, I am not persuaded by Payless' argument that there is no genuine

issue of fact that adidas should have known of Payless' use of stripes in the 1970s, 80s, or 90s.

As adidas points out, many of the striped shoes Payless sold during that period are substantially

different in appearance than the shoes at issue in this case.  Some of those shoes bear non-

parallel stripes.  Others have horizontal stripes bisecting the two- or four-parallel stripes.  Still

others have velcro straps or cartoon designs obscuring the stripes.  adidas does not challenge the

use of two or four stripes in the abstract, but the use of two- or four-stripe designs that are

<u>confusingly similar</u> to the Three-Stripe Mark or Superstar Trade Dress.  In other words, "the

issue is not simply the number of stripes. Instead, the issue is whether the total effect of the

allegedly infringing design is likely to cause confusion in the minds of an ordinary person."

<u>adidas v. Target</u>, 228 F. Supp. 2d at 1211; <u>see</u> <u>also</u> <u>Sara Lee Corp. v. Kayser-Roth Corp.</u>, 81 F.3d

455, 462 (4th Cir. 1996) (A trademark owner need not sue "until the likelihood of confusion

looms large."); <u>ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical</u>

<u>Therapy P.C.</u>, 314 F.3d 62, 70 (2d Cir. 2002) ("[A] plaintiff should not be obligated to sue until

its right to protection has ripened such that plaintiff knew or should have known . . . that [it] had

a provable infringement claim . . . .").

　　　　There are also genuine issues of fact as to whether Payless' sales and advertisement of

two- and four-stripe footwear during the 1970s, 1980s, and 1990s were so "pervasive, open, and

notorious" that adidas should have known it had a potential infringement claim.  <u>Hall v. Aqua</u>

<u>Queen Mfg., Inc.</u>, 93 F.3d 1548, 1553 (Fed. Cir. 1996).  Payless has submitted no evidence of

any <u>actual</u> sales of shoes bearing two or four stripes for any year prior to 1994.  The evidence

Payless' submitted of sales between 1995 and 1999 consists solely of lists of lot numbers without

any images of the shoes, and thus it is unclear whether those sales are even relevant (<i>i.e.</i>, how

many stripes were on those shoes, or the location, shape, or direction of the stripes).  Further,

Payless' evidence of T.V. ads and newspaper inserts from that period depict shoes with stripe-

like features together with several other shoe styles, making it difficult to pick out the striped

shoes in question.  Finally, there is no evidence of the scope of distribution of those ads, making

it difficult to determine when the ads ran, what markets they ran in, or how often they ran.  Thus,

I cannot conclude as a matter of law that adidas should have been aware Payless' activities.

I am also not persuaded by Payless' argument that the laches period began no later than

1994, when Payless' informed adidas that it was selling shoes with four double-serrated stripes.

As discussed above, adidas filed suit against Payless in 1994 when it learned that Payless was

selling footwear with three parallel double-serrated stripes.  Although none of the accused shoes

in the 1994 case had two- or four-parallel stripes, Payless' counsel advised adidas during the

course of the parties' negotiations that it was selling shoes with four double-serrated stripes that

were similar to the accused shoes in that case.  <u>See</u> Garrison Decl., Ex. B.  The parties then

specifically negotiated and agreed to limit Payless' ability to sell shoes with two-, three-, or four-

parallel double-serrated stripes.  <u>See</u> Feldman Ex. C (Agreement)  The <u>inclusion</u> of two- and

four-stripe shoes in the final 1994 Settlement Agreement indicates that adidas <u>objected</u> to

Payless' use of potentially infringing two- or four-parallel stripes.  That cannot reasonably be

characterized as evidence that adidas was "sleep[ing] on [its] rights."  <u>Jarrow Formulas</u>, 304 F.3d

at 835.  In any event, the parties conducted no discovery in the 1994 case, so adidas had no

reason to believe that Payless was selling "other" potentially infringing shoes, or that the

settlement agreement would not be sufficient to protect its rights.

Finally, neither adidas' 1997 cease-and-desist letter regarding "athletic slides" (i.e., flip-

flops), nor its possession of a Payless "Eagle ProWings" shoe with four stripes establishes, as a matter of law, that adidas knew of Payless' potentially infringing conduct in 1997. As discussed above, in determining the length of delay for the purposes of laches, the court must "focus on the conduct upon which the claimant bases its infringement claim." Tillamook Country Smoker, 311 F. Supp. 2d at 1032. Here, adidas has alleged infringement of the Three-Stripe Mark as applied to athletic or casual footwear. adidas has not accused any "slides" in this case. The cease-and-desist letter regarding Payless' "slides" does not prove adidas knew or should have known of Payless' sale of potentially infringing athletic and casual footwear. With respect to the Payless four-stripe "Eagle ProWings," the issue is "not simply the number of stripes. Instead, the issue is whether the total effect of the allegedly infringing design is likely to cause confusion in the minds of an ordinary purchaser." adidas v. Target, 228 F. Supp. 2d at 1211. Like many of Payless' other striped shoes from the 1970s, 80s, and 90s, the "Eagle ProWings" is different in appearance than any of the accused footwear in this case. None of the accused shoes have a prominent black "wave" that cuts across the shoe and though the stripe design. Moreover, the stripes on the side of the "Eagle ProWings" do not appear to be parallel or equidistant. In other words, there are issues of fact as to whether the "Eagle ProWings" was sufficiently similar to adidas' mark, such that adidas should have known it had a potential infringement claim.

Accordingly, I find that there are genuine issues of material fact as to whether adidas knew or should have known of Payless' potentially infringing course of conduct prior to November 1999 (i.e., within Oregon's analogous two year limitations period for fraud claims). As such, I cannot conclude that adidas' delay in bringing suit was either reasonable or unreasonable, as a matter of law. Thus, Payless' motion for summary judgment on the issue of

PAGE 60 - REDACTED OPINION AND ORDER

laches must be denied.

### b. Prejudice

Even though there are genuine issues of fact as to whether adidas' delay in filing suit was unreasonable, I conclude that adidas is entitled to summary judgment on Payless' laches defense because Payless cannot demonstrate that it suffered prejudice as a result of adidas' delay.

"Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense." A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1033 (9th Cir. 1992); see also Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 999 (9th Cir. 2006) ("In addition to establishing that Plaintiffs' delay in filing suit was unreasonable, [the defendant] must demonstrate that it has been prejudiced by the delay."). Indeed, "[l]aches is not a doctrine concerned solely with timing. Rather, it is primarily concerned with prejudice." In Re Beaty, 306 F.3d 914, 924 (9th Cir. 2002). There are "two chief forms of prejudice in the laches context—evidentiary and expectations-based." Danjaq, 263 F.3d at 955.

### i. Evidentiary Prejudice

"Evidentiary prejudice includes such things as lost, stale, or degraded evidence, or witnesses whose memories have faded or who have died." Id. Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." A.C. Aukerman, 960 F.2d at 1033. A defendant must identify key witnesses or evidence whose "absence has resulted in the [defendant's] inability to present a full and fair defense on the merits." Freeman v. Gerber Prods. Co., 466 F. Supp. 2d 1242, 1246 (D. Kan. 2006).

Here, Payless has failed to identify any <u>specific</u> missing evidence or witness, whose "absence has resulted in [Payless'] inability to present a full and fair defense <u>on the merits</u>." <u>Gerber Prods. Co.</u>, 466 F. Supp. 2d at 1246 (emphasis added). Though Payless asserts that it has lost evidence of shoe sales, designs, and advertisements from the 1970s, 80s, and early 90s, that evidence is of little value in determining whether the specific shoes at issue (none of which were sold before 1998) infringe adidas' mark. In other words, Payless' allegedly missing evidence is not relevant to the merits of adidas' claims, and thus its absence does not "undermin[e] the court's ability to judge the facts" of adidas' claims. <u>A.C. Aukerman</u>, 960 F.2d at 1033.

Furthermore, Payless' "[c]onclusory statements that there are missing witnesses, that witnesses' memories have lessened, and that there is missing documentary evidence, are not sufficient" to establish evidentiary prejudice. <u>See Meyers v. Asics Corp.</u>, 974 F.2d 1304, 1308 (Fed. Cir. 1992); <u>Bayer AG v. Sony Elecs., Inc.</u>, 229 F. Supp. 2d 332, 367-68 (D. Del. 2002) (both rejecting claims of evidentiary prejudice because defendant failed to demonstrate the absence of specific witnesses or documents and why that evidence was important to the case). To prove evidentiary prejudice, Payless must do more than speculate as to evidence that might have been available had adidas sued at an earlier date.

### ii. Expectations-Based Prejudice

A defendant may establish expectations-based prejudice "by showing that during plaintiff's delay, it invested money to expand its business or entered into business transactions based on [its] presumed rights." <u>Miller</u>, 454 F.3d at 999 (9th Cir. 2006). The courts that have found expectation-based prejudice, however, have done so only where the defendant was using the infringing word or design <u>as a trademark</u>, and thus had built up goodwill in the mark as a

PAGE 62 - REDACTED OPINION AND ORDER

designation of source.  See Tillamook Country Smoker, 311 F. Supp. 2d at 1039 (finding

expectation-based prejudice where defendant "actually spent money promoting its brand name,"

thereby "occasioning substantial goodwill for [it]") (emphasis added);  Jarrow Formulas, 304

F.3d at 839 ("If [plaintiff] had filed sooner, [defendant] could have invested its resources in

shaping an alternative identity . . . in the minds of the public.") (emphasis added); Grupo Gigante

SA De CV v. Dallo & Co., Inc., 391 F.3d 1088, 1105 (9th Cir. 2004) ("[A] defendant can make

the required showing of prejudice by proving that it has continued to build a valuable business

around its trademark during the time that the plaintiff delayed the exercise of its legal rights.");

see also Bridgestone/Firestone Research, Inc. v. Automotive Club  De L'Quest De La France,

245 F.3d 1359, 1363 (Fed. Cir. 2001) ("Economic prejudice arises from investment in and

development of the trademark, and the continued commercial use and economic promotion of a

mark over a prolonged period . . . .") (emphasis added); McCarthy § 31:12 ("Laches is a good

defense if plaintiff's long failure to exercise its legal rights has caused defendant to rely to his

detriment by building up a valuable business around its trademark.") (emphasis added).  This is

because laches is premised, in part, on the notion that it would be inequitable to allow a dilatory

plaintiff to divest a defendant of its trade name, and the goodwill it has built around that name,

thereby requiring the defendant to "recast" its entire business identity and "re-educate" its

consumers.  See Landers, Frary, & Clark v. Universal Cooler Corp., 85 F.2d 46, 49 (2d Cir.

1936) (J. Hand); Tillamook Country Smoker, 311 F. Supp. 2d at 1038.  It would be difficult to

even "estimate what the losses" would be from such a "dislocation" of the defendant's business

identity.  Landers, 85 F.2d at 49.  Thus, the cases make clear that expectation-based prejudice is

not simply a matter of expending resources promoting a potentially infringing design.  Tisch


PAGE 63 - REDACTED OPINION AND ORDER

Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609, 615 (7th Cir. 1965).  If so,  "relief would have to be denied in practically every case of delay."  Id.  Instead, the defendant must show that the expenditures were made promoting the design as its trademark, or as part of its business identity. Jarrow Formulas, 304 F.3d at 839.

Here, Payless' investment in marketing and selling the allegedly infringing two- and four-stripe shoes at issue cannot serve as a basis for expectations-based prejudice because Payless acknowledges that it uses stripes merely for decoration and not as a trademark, or indicator of source.  Austin Dep., at 121:6-10; Bone Dep., at 124:24-125:4; see also Payless Mem. in Supp. of Mot. for Summ. J. on Pls.' Trademark and Trade Dress Infringement Claims, at 20 ("Payless . . . uses two and four stripes on shoes not to signify source, but as mere decoration or ornamentation.").  Payless has proffered no evidence that it has built up any goodwill, or association in the minds of consumers between its business and its use of stripes on shoes. Indeed, Payless acknowledges that it has not built its business identity around the use of two- or four-stripes on shoes.  As such, Payless' entire business would not have to be "recast," nor would its market need to be "re-educated" if it were divested of the ability to use of two- or four-parallel, equidistant stripes, running diagonally from the mid-sole to the laces of its shoes. Indeed, Payless' damages experts acknowledged that if Payless were unable to sell the allegedly infringing striped shoes at issue, it could easily and without expense fill its stores with non-infringing shoes.  Horace Dep. (vol. 2), at 60:8-11.  Payless' economic investment in the use of ornamental or decorative stripe designs, which are not intended to signify source, cannot constitute expectations-based prejudice.

Finally, Payless' potential liability for damages attributable to a finding of liability for

infringement cannot constitute economic prejudice for the purposes of laches. <u>A.C. Aukerman</u> <u>Co.</u>, 960 F.2d 1020, 1033. Such a rule would result in material prejudice in every infringement action. <u>Id.</u>; <u>see also</u> <u>Leatherman Tool Group, Inc. v. Alltrade, Inc.</u>, No. 98-423-KI, 1999 WL 37827 (D. Or. Apr. 26, 1999) (finding damages for liability for infringement insufficient to show expectations-based prejudice).

Because Payless cannot demonstrate any legally cognizable prejudice as a result of adidas' alleged delay in bringing suit, Payless' laches defense fails as a matter of law. adidas is entitled to summary judgment as to Payless' laches claim.

### 2. Waiver

"Waiver is the intentional relinquishment of a known right with knowledge of its existence and the intent to relinquish it." <u>United States v. King Features Entm't, Inc.</u>, 843 F.2d 394, 399 (9th Cir. 1988). "Although mere silence can be a basis for a claim of estoppel when a legal duty to speak exists, waiver must be manifested in an unequivocal manner" <u>Duncan v.</u> <u>Office Depot</u>, 973 F. Supp. 1171, 1177 (D. Or. 1997); <u>see also</u> <u>United States v. Anwest Surety</u> <u>Ins. Co.</u>, 54 F.3d 601, 602-03 (9th Cir. 1995) (quoting <u>Groves v. Prickett</u>, 420 F.2d 1119, 1125 (9th Cir. 1970) ("An implied waiver of rights will be found where there is 'clear, decisive and unequivocal' conduct which indicates a purpose to waive the legal rights involved.").

Here, Payless has failed to proffer any evidence of a "clear, decisive and unequivocal" intent by adidas to relinquish any of its trademark or trade dress rights. adidas' "failure to act, without more, is insufficient evidence of [its] intent to waive its right to claim infringement." <u>Novell, Inc. v. Weird Stuff, Inc.</u>, No. C92-20467, 0094 WL 16458729, at *12-13 (N.D. Cal. Aug. 2, 1993). The undisputed facts show that adidas has enforced its rights against Payless and

others.  adidas' failure to prevent <u>all</u> third parties from selling <u>any</u> two- and four-striped shoes is not sufficient to prove adidas' express and affirmative intent to relinquish its rights. <u>See</u> <u>Novell</u>, 0094 WL 16458729, at *13 ("[E]ven if [plaintiff] failed to take preventative measures to stop [defendant's infringement-related activities, failure to act, without more is insufficient evidence of the trademark owner's intent to waive its right to claim infringement.").

Finally, Payless neither cites, nor is the court aware of any authority to support the proposition that adidas waived its trademark rights against Payless simply by agreeing not to sue K-Swiss, or its licensees for using four stripes on shoes.  <u>See</u> Garrison Decl., Ex. O (adidas-K-Swiss agreement) "[T]rademark agreements are favored in the law as a means by which parties agree to market products in a way that reduces the likelihood of consumer confusion and avoids time-consuming litigation."  <u>Clorox Co. v. Sterling Winthrop, Inc.</u>, 117 F.3d 50, 60 (2d Cir. 1997).  That adidas and K-Swiss agreed not to sue each other for using four stripes on shoes is not sufficient to establish a triable issue of fact on the defense of waiver.  Thus, Payless' waiver defense fails as a matter of law.

**3. Estoppel**

"Unlike waiver, estoppel focuses not on a party's intent, but rather on the effects of his conduct on another.  Estoppel arises only when a party's conduct misleads another to believe that a right will not be enforced and causes him to act to his detriment in reliance upon this belief." <u>Novell</u>, 0094 WL 16458729, at *13 (citing <u>Saverslak v. Davis-Cleaver Produce Co.</u>, 606 F.2d 208, 213 (7th Cir. 1979).  To prevail on its equitable estoppel defense, Payless must prove: (1) adidas knew Payless was selling potentially infringing two- and four-stripe footwear; (2) adidas' actions or failure to act led Payless to reasonably believe that adidas did not intend to

PAGE 66 - REDACTED OPINION AND ORDER

enforce its trademark right against Payless; (3) Payless did not know that adidas actually objected to the sale of its potentially infringing footwear; and (4) due to its reliance on adidas' actions, Payless will be materially prejudiced if adidas is allowed to proceed with its claim. Lehman v. United States, 154 F.3d 1010, 1016 (9th Cir. 1998); A.C. Aukerman Co., 960 at 1028. "Where any one of the elements of equitable estoppel is absent, the claim must fail." Am. Casualty Co. v. Baker, 22 F.3d 880, 892 (9th Cir. 1994).

As discussed supra, Section III.E.1.b, Payless cannot demonstrate that it suffered any legally cognizable prejudice as a result of adidas' inaction.  In addition, Payless proffers no evidence that adidas' failure to act caused Payless to sell potentially infringing footwear.  In other words, there is no evidence that Payless actually relied on adidas' alleged inaction. Because Payless cannot prove each element of equitable estoppel, the defense must fail.

### 4. Acquiescence

"Estoppel by acquiescence includes the two elements of laches—(1) plaintiff's unreasonable and inexcusable delay, (2) inducing the belief that it has abandoned its claim against the infringer—and adds (3) affirmative conduct inducing the belief that it has abandoned its claim against the alleged infringer, and (4) detrimental reliance by infringer." E & J Gallo Winery, 905 F. Supp. at 1414.  "The distinguishing feature of the acquiescence defense is the element of active or explicit consent to the use of an allegedly infringing mark." SunAmerica Corp. v. Sun Life Assur. Co. of Canada, 77 F.3d 1324, 1344 (11th Cir. 1996) (emphasis in original).

Payless' acquiescence defense fails as a matter of law because Payless has failed to demonstrate any detrimental reliance resulting from adidas' alleged delay in filing suit.  Novell,

Inc., 0094 WL 16458729, at *13.  In any event, Payless has failed to proffer any evidence of "affirmative conduct" or "active encouragement" by adidas, which would induce Payless to believe that it had abandoned its claim. McCarthy § 31:42.  The only conduct Payless alleges in support of its acquiescence defense is adidas' objection to the sale of four-stripe slides in 1997, and adidas alleged failure to "follow-up" on its 1997 cease and desist letter.  But adidas' failure to follow-up is not sufficient to support a finding of estoppel by acquiescence.  See Plasticolor Molded Prods.. v. Ford Motor Co., 698 F. Supp. 199, 202-203 (C.D. Cal. 1998) ("[M]ore than merely passive consent is required; the trademark owner must have, by affirmative word or deed, conveyed its implied consent.").  Likewise, adidas' trademark agreement with K-Swiss is not evidence that adidas "affirmatively" acted to abandon its claim against Payless.  Thus, the defense fails.

### 5. Abandonment-Related Defenses and Counterclaims

Payless' Fourth Counterclaim alleges "adidas has abandoned any claim of exclusive right to use the Three-Stripe Mark," and seeks an order cancelling adidas' various Three-Stripe Mark registrations.  Payless Answer, ¶¶ 42, 44.  Payless' Tenth Affirmative Defense alleges adidas has "abandoned any claims that [its] rights are infringed by the manufacturing, use or sale of footwear bearing less . . . or more than three stripes, and have abandoned any claims that its rights are infringed by use of . . . elements of the alleged Superstar trade dress."  Payless Answer, at 9-10.  Payless' Twelfth and Thirteenth Affirmative Defenses allege the Three-Stripe Mark and the Superstar Trade Dress have "lost any alleged secondary meaning," and have become "generic." Id. at 10.  Each of these defenses appears to be premised on the theory that by adidas has abandoned or weakened the Three-Stripe Mark and Superstar Trade Dress by allowing

numerous third parties to use two- and for-stripe designs.

In cases like this, where a defendant is not claiming non-use of the trademark, "a mark shall be deemed 'abandoned' . . . when any course of conduct of the owner, including acts of omission as well as commission causes the <u>mark</u> to become . . . generic . . . , or otherwise to lose its significance as a mark." 15 U.S.C. § 1127 (emphasis added). In reviewing allegations that a plaintiff has abandoned a trademark by failing to enforce it, the Ninth Circuit has held that the mere existence of third-party infringers is irrelevant. <u>See</u> <u>Eclipse Assocs. Ltd. v. Data Gen. Corp.</u>, 894 F.2d 1114, 1119 (9th Cir. 1990) ("Evidence of other potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law."). Though a plaintiff's failure to sue potentially infringing third parties may be relevant to the <u>strength of the mark</u>, "[a]bandonment . . . requires proof that the mark has lost <u>all</u> significance as an indication of origin. That is, the mark is completely without signs of life." <u>McCarthy</u> § 17:17 (emphasis in original); <u>see</u> <u>also</u> <u>Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.</u>, 270 F.3d 298, 310 (6th Cir. 2001) ("[A]bandonment occurs 'only when all rights of protection are extinguished.'") (citation omitted). "Abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved." <u>Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp.</u>, 694 F.2d 1150, 1156 (9th Cir. 1982).

adidas argues that Payless cannot prove abandonment because there is "no basis" in the record to conclude that either the "Three-Stripe Mark or Superstar Trade Dress ha[ve] lost <u>all</u> significance as an indicator of source." adidas' Mem. in Supp. of Mot. for Summ. J., at 33 (emphasis in original). By failing to respond to adidas' legal abandonment argument, Payless effectively concedes that adidas' has <u>not</u> abandoned its rights in the Three-Stripe Mark or its

Superstar Trade Dress.  See Defs.' Opp. to Pls.' Mot. for Partial Summ. J., at 41 ("Adidas [sic]

mischaracterizes the nature of Payless' [defenses] as alleging that Adidas [sic] has abandoned all

rights in its three-stripe mark or alleged Superstar Trade Dress. . . . that is not at all what Payless

has alleged."); see also Nevada Shell Dealers Ass'n v. Shell Oil Co., 725 F. Supp. 1104, 1109 (D.

Nev. 1989) (finding that party opposing summary judgment implicitly conceded an issue by

failing to respond to movant's argument).  Instead, Payless now argues that its Tenth and Twelfth

Affirmative Defenses and its Fourth Counterclaim actually allege adidas has "abandoned . . . and

weakened/diluted its ability to enforce the Three-Stripe Mark against shoes with two and four

stripes" by permitting numerous third parties to use two and four stripes on footwear.  Defs.'

Opp., at 41-42 (emphasis in original).

Payless' attempt to recast its counterclaim and affirmative defenses as claims alleging

abandonment of the ability to enforce its mark against shoes two and four stripes is unavailing.

The language of Payless' Answer makes clear that despite its present argument to the contrary,

Payless was, in fact, claiming that adidas had abandoned the Three-Stripe Mark under 15 U.S.C.

§ 1127.  Indeed, the Fourth Counterclaim is entitled "Declaration of Abandonment and

Cancellation of Plaintiff's Three Stripe Mark Registrations," and Payless cites to the section of

the Lanham Act that defines abandonment, 15 U.S.C. § 1127.  See Answer, at pp. 16-18.  In the

counterclaim, Payless alleges "adidas has abandoned any claim of exclusive right to use the

Three-Stripe Mark," that "adidas has caused the Three Stripe Mark to lose its significance as a

trademark and to become abandoned by operation of law," and that adidas' "marks were

abandoned due to its course of conduct."  Id. ¶ 42-47.  Payless even requests that the court cancel

each of adidas' "now abandoned Three Stripe Mark" registrations because they "rel[y] on the

abandoned Three Stripe Mark." Id. ¶ 44.  Moreover, Payless' Rule 30(b)(6) witness testified that

this counterclaim was alleging that adidas' "conduct has affected an abandonment of the mark."

Horace Dep., at 58:9-59:22.  Similarly, Payless' Tenth and Twelfth Affirmative Defenses allege

that adidas "abandoned" its claims and that the Three-Stripe Mark and Superstar Trade Dress

have "lost their ability to identify a single source, and lost any alleged secondary meaning," or

have become "generic."  All of these allegations plainly mirror the language of a legal

abandonment claim under 15 U.S.C. § 1127.  Given that Payless now admits adidas has not

abandoned its Three-Stripe Mark and its Superstar Trade Dress, adidas is entitled to summary

judgment as to Payless' Fourth Counterclaim, and its Tenth, Twelfth, and Thirteenth Affirmative

Defenses.

        In any event, Payless claim that adidas has abandoned its ability to enforce its mark

against two or four stripes by permitting third parties to use those designs is not a cognizable

defense or counterclaim.  Under 15 U.S.C. § 1127, "a mark shall be deemed 'abandoned' . . .

when any course of conduct of the owner, including acts of omission as well as commission

causes the mark to become . . . generic . . . , or otherwise to lose its significance as a mark."  The

plain language of the statute makes clear that legal abandonment involves the abandonment of

the owner's mark.  adidas does not claim to own a two- or four-stripe mark, and therefore cannot

abandon those marks under the statute.  Payless' abandonment claim is, in substance, simply a

restatement of Payless' affirmative defenses of laches, waiver, estoppel, and acquiescence.  To

the extent that Payless alleges adidas' rights have been weakened or diluted by third-party uses

(but not to the point of losing all trademark significance), this is not an affirmative defense, but

rather a part of the likelihood of confusion analysis. As Professor McCarthy notes:

PAGE 71 - REDACTED OPINION AND ORDER

> What is the significance . . . an alleged failure to prosecute?  If the argument is couched in terms of alleged 'abandonment,' it is far from the mark.  Such an argument is no more persuasive than that of a drunken driver who pleads to be let off because there are 'lots of other drunk drivers on the road—why pick on me?'  This is not a 'defense,' nor should it be.  Rather it appears that the only relevancy of failure to prosecute others is as to the possible impact such failure may have on the strength of the plaintiff's mark.  It is possible that plaintiff's mark has been 'weakened' by widespread use in the market and that such use resulted from plaintiff's failure to sue infringers.

McCarthy § 17:17 (citations omitted).  Here, third-party uses of two- or four-stripe designs is relevant to the strength of the mark, not abandonment.  Similarly, Payless' "genericness" defense relates solely to the strength of the Three-Stripe Mark under the likelihood of confusion analysis.  Accordingly, adidas is entitled to summary judgment as to Payless' Fourth Counterclaim and its Tenth, Twelfth, and Thirteenth Affirmative Defenses.

### 6. Payless' Antitrust Misuse/Unclean Hands Defense

Payless' Seventh (Unclean Hands) and Eighth (Trademark Misuse/Antitrust) Affirmative Defenses, and its Second and Third (Unfair Competition and Deceptive Trade Practices) Counterclaims all rely on the same set of factual and legal arguments[16]—that is, adidas is an active participant in an anti-competitive conspiracy to restrain trade in violation of Section 1 of the Sherman Act.[17]  Though its Answer to adidas' Third Amended Complaint is devoid of any

---

[16]Payless acknowledges that "both the unclean hands and antitrust defenses essentially comprise the same set of facts and arguments." Def.'s Opp.to Pls.' Mot. for Partial Summ. J., at 1; see also Def.'s Opp., at 8 (Payless' Second and Third Counterclaims are "premised upon the same facts underlying Payless' unclean hands and trademark misuse/antitrust defenses.").

[17]  Payless concedes that it has no defense or claim under section 2 of the Sherman Act. See Def.'s Opp., at 2 (adidas' arguments that (1) Payless' failed to identify a relevant antitrust market and (2) trademark enforcement efforts are immune from antitrust scrutiny are "based on [adidas'] erroneous assumption that Payless' allegations fall within Section 2 of the Sherman Act.").

PAGE 72 - REDACTED OPINION AND ORDER

mention of "Section 1," "conspiracy," or "agreement," Payless now asserts that in 2007, adidas

and K-Swiss, Inc. agreed to "refrain from selling their products to value-based retailers, like

Payless," and to "assist one another . . . in the enforcement of their respective rights against third

parties that use designs consisting of four parallel or nearly parallel stripes . . . ." Def.'s Opp., at

6, 7.  Payless maintains that the 2007 Agreement constitutes a per se illegal antitrust conspiracy

to divide-up the stripe-shoe market, and a group boycott designed to eliminate competition.  I

disagree.

### a. Legal Standards

Use of a trademark in violation of the antitrust laws may be a valid basis for an

antitrust/unclean hands defense to trademark infringement.[18]  See Carl Zeiss Stiftung v. V.E.B.

Carl Zeiss, Jena, 298 F. Supp. 1309, 1314 (D.C.N.Y. 1969) ("[A] court, in the exercise of its

equity powers, may deny enforcement of a trademark on the part of one who has used that

trademark in violation of the antitrust laws.");  McCarthy § 31:91.  Nevertheless, the defense is

very narrow, Estee Lauder, Inc. v. Fragrance Counter, Inc., 189 F.R.D. 269, 272 (S.D.N.Y.

1999), and "in almost every reported instance where the antitrust misuse of a trademark has been

raised as a defense, it has been rejected." See Carl Zeiss, 298 F. Supp. at 1314 (citing cases

---

[18]Payless proffers no evidence that would support a traditional unclean hands affirmative
defense, which generally requires a defendant to "show that plaintiff used the trademark to
deceive consumers," Japan Telecom, Inc. v. Japan Telecom Am. Inc., 287 F.3d 866, 870 (9th
Cir. 2002).  To the extent that Payless' unclean hands/trademark misuse-antitrust defenses are
premised upon adidas' aggressive trademark enforcement efforts, those claims are barred under
the Noerr-Pennington doctrine.  See Prof'l Real Estate Investors, Inc. v. Columbia Pictures
Indus., Inc., 508 U.S. 49, 56 (1993) (Under the *Noerr-Pennington* doctrine, "[t]hose who petition
government for redress are generally immune form antitrust liability."); Sosa v. DIRECT TV,
Inc., 437 F.3d 923, 936-38 (9th Cir. 2006) (extending *Noerr-Pennington* immunity to litigation-
related activities prior to formal commencement of litigation).

rejecting antitrust misuse-unclean hands defense because defendant failed to establish that the trademark "was itself being used as the prime and effective instrument to effectuate antitrust activity.").

### b. Payless Failed to Plead a Sherman Act Section 1 Defense

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  The Supreme Court has explained that for pleadings to be sufficient to state a Section 1 claim under the Sherman Act, a claimant must go beyond conclusory and formulaic statements and must allege "enough factual matter (taken as true) to suggest that an agreement was made."  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007); see also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 508 (9th Cir. 1989) (To state a claim under section 1 of the Sherman Act, the claimant "must, at a minimum, sketch the outline of the antitrust violation with allegations of supporting factual detail.").  Though Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," a claimant's pleadings must "possess enough heft to 'show that the pleader is entitled to relief.'" Twombly, 127 S.Ct. at 1966.  In other words, the pleadings must set forth enough facts to suggest that "the agreement necessary to make out a Section 1 claim" was is in fact made. Id. It is well-established that counterclaims "must be pleaded as fully and distinctly and with the same substantial requisites as an original cause of action." Mut. Life Assur. Co. v. Leimer, D.C., 3 F.R.D. 145 (D. Mo. 1942); Fed. R. Civ. P. 8(a).

Here, Payless' failed to properly plead a Section 1 conspiracy claim.  Payless' pleadings bear no mention of any "conspiracy," "contract," "agreement," or a restraint on trade.  See Def.'s

Answer, at 9, 14-16.  In fact, Payless' pleadings more closely resemble a Section 2 attempted monopoly claim than a Section 1 conspiracy claim.  See id. at 9 (attempting to misuse their trademark "to acquire a monopoly") (Eighth Defense); id. at 14 (adidas is "misusing its trademark registrations to impermissibly claim the exclusive right to a variety of" stripes on footwear) (Second Counterclaim); id. at 15 ("filing frivolous and meritless lawsuits . . . threatening to take legal action against competitors").  Payless' first mention of any agreement or conspiracy to restrain trade occurs in its memorandum in opposition.  Indeed, Payless' Rule 30(b)(6) witness for these defenses and counterclaims failed to identify any facts to support a Section 1 claim and confirmed that its antitrust misuse-unclean hands defense was premised on adidas' aggressive enforcement efforts.  Horace Dep. at 50:13-58:8; 78:24-82:23.  Even if I were persuaded by Payless' attempt to read "conspiracy" into its Rule 30(b)(6) witness' testimony (which I am not), that testimony cannot overcome Payless' failure to allege any agreement in restraint of trade.  Payless' pleadings do not sufficiently state a claim for a violation of Section 1 of the Sherman Act because they are devoid of any mention of an agreement or conspiracy to restrain trade.  As such, Payless' 7th and 8th Affirmative Defenses (unclean hands and trademark misuse/antitrust), and Payless' Second and Third Counterclaims (unfair competition and deceptive trade practices) fail.

c. Payless Cannot Prove a Sherman Act Section 1 Defense

Even if Payless' pleadings were sufficient to properly allege a Section 1 conspiracy claim, Payless has failed to present sufficient evidence to support such a claim.  Payless has presented no evidence to suggest that adidas trademark "was itself being used as the prime and effective instrument to effectuate the antitrust activity."  Carl Zeiss, 298 F. Supp. at 1314. Instead, Payless

argues adidas unlawfully conspired with K-Swiss to refrain from selling their respective products at value-based retail outlets like Payless ShoeSource, and to assist one another in the enforcement of their respective rights.  As several courts have recognized, such conduct, even if it pertains to products bearing trademarks, cannot be all that is required to establish the antitrust misuse defense.  See e.g., Carl Zeiss, 298 F. Supp. at 1314-15 (defendant's allegations of a group boycott and a conspiracy to control prices is insufficient to establish antitrust misuse-unclean hands defense); R.J. Reynolds Tobacco Co. v. Premium Tobacco Stores, Inc., No. 99-C-1174, 2001 WL 747422, at *4-5 (N.D. Ill. 2001) (defendant's allegation that plaintiff conspired with others to refuse to sell its trademarked products to defendant was insufficient to support the antitrust misuse-unclean hands defense). If such conduct were sufficient to establish an antitrust misuse-unclean hands defense, "any antitrust violation in the distribution of . . . merchandise would result in forfeiture of the trademark." Carl Zeiss, 289 F. Supp. at 1315.  Thus, "it is not enough merely to prove that merchandise bearing a trademark  . . . has been used in furtherance of antitrust violations." Id.  Rather, the party invoking the defense must also establish "that the mark itself has been the basic and fundamental vehicle required and used to accomplish the violation." Id.  Here, Payless' contention that adidas and K-Swiss have engaged in a conspiracy to refuse to sell their products at Payless retail stores and to assist one another in enforcing their rights is insufficient to establish support the antitrust misuse-unclean hands defense.  Cf. R.J. Reynolds, 2001 WL 747422, at *5.

Further, Payless' conclusory assertions that adidas' agreement with K-Swiss constitutes an unlawful effort to "divide-up the stripe-shoe market" and a group boycott are insufficient to establish a per se violation of Section 1 of the Sherman Act.  The per se analysis applies to

practices that are presumptively illegal, such as: (1) horizontal and vertical price-fixing; (2)

horizontal market division; (3) group boycotts and refusals to deal; and (4) certain tie-in sales.

Cascade Cabinet Co. v. Western Cabinet & Millwork Inc., 710 F.2d 1366, 1370 (9th Cir. 1983).

Courts will not apply the per se analysis unless the agreement at issue "facially appears to be one

that would always or almost always tend to restrict competition."  Nat'l Collegiate Athletic Ass'n

v. Bd. of Regents of University of Oklahoma, 468 U.S. 85, 104 (1984).

    Payless presents no evidence to support the existence of a so-called "stripe-shoe market,"

or to show that adidas attempted to exclude or boycott any competitor.  To the contrary, the

agreement reflects adidas' and K-Swiss' legitimate efforts to protect their respective marks and

avoid consumer confusion.  By Payless' own account, K-Swiss agreed to refrain from using four-

stripe designs to avoid consumer confusion, and assist each other in enforcing their respective

rights.  Such agreements "are favored in the law as a means by which parties agree to market

products in a way that reduces the likelihood of consumer confusion and avoids time-consuming

litigation." Clorox, 117 F.3d at 60.  That adidas and K-Swiss agreed not to sell their respective

products at Payless retail outlets is insufficient to establish a group boycott.  See Mutual Fund

Investors, Inc. v. Putnam Management Co., Inc., 553 F.2d 620, (9th Cir. 1977) ("[A] corporation

has the right to deal with whom it pleases and to select its customers, provided there is no effect

which contravenes the antitrust laws.").

    Payless has also failed to establish a violation of the Section 1 under the "rule of reason."

To establish a Section 1 violation under the "rule of reason," a claimant must prove: (1) an

agreement, among two or more persons or distinct business entities; (2) which is intended to

harm or unreasonably restrain competition; and (3) which actually causes injury to competition

PAGE 77 - REDACTED OPINION AND ORDER

within a field of commerce in which the claimant is engaged. <u>Coastal Transfer Co. v. Toyota</u>

<u>Motor Sales, U.S.A.</u>, 833 F.2d 208, 211 (9th Cir. 1987). Payless' Section 1 claim fails on several

grounds. First, Payless points to no evidence that the agreement between adidas and K-Swiss

was motivated by a desire to curtail competition. Payless' conclusory assertions that adidas and

K-Swiss entered the agreement to divide a market or boycott a competitor are insufficient to

raise a genuine issue of fact. <u>Cf</u>. <u>Mysushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,

586 (1986) ("metaphysical doubt as to the material facts" is insufficient to raise a genuine issue

of fact). Further, Payless proffers no evidence to suggest that the agreement at issue actually

"results in an unreasonable restraint" on competition. <u>Cal. Packing Corp. v. Sun-Maid Raisin</u>

<u>Growers</u>, 165 F. Supp. 245, 250-52 (S.D. Cal. 1958). Agreements that restrict a competitor's

ability to use a particular mark cannot have any meaningful exclusionary or anticompetitive

effect because the competitor remains free to sell its goods using a different mark. <u>Clorox</u>, 117

F.3d at 56. Furthermore, "because the antitrust laws exist to protect competition, not

competitors, . . . it is difficult to show that an unfavorable trademark agreement raises antitrust

concerns." <u>Id</u>. at 57.

Payless has neither pleaded nor proved an antitrust misuse-unclean hands defense under

Section 1 of the Sherman Act. Because Payless concedes that its Seventh and Eighth

Affirmative Defenses and its Second and Third Counterclaims are all premised upon the same

factual bases and legal arguments, adidas is entitled to summary judgment on each of those

affirmative defenses and counterclaims.

### 7. Contractual Estoppel and Breach of Contract

Payless' Third and Eleventh Affirmative Defenses (contractual estoppel) and its First

PAGE 78 - REDACTED OPINION AND ORDER

Counterclaim (breach of contract) are premised on the notion that adidas' claims are barred by its failure to perform its contractual obligations under the parties' 1994 Settlement Agreement.

### a. Breach of Contract

In its First Counterclaim, Payless alleges that the 1994 Agreement included "specific non-infringement design standards" which allowed Payless to sell shoes bearing two and four stripes with straight edges. Payless Answer, at ¶¶ 8, 12. Pursuant to the agreement, adidas agreed "not to take legal action against Payless based solely on the use of stripes on Payless footwear that comply with [those] design standards." Id. at ¶ 12. Payless contends it has fully complied with the design standards set out in the agreement, and therefore adidas breached the agreement by filing this infringement action based on Payless' use of such design standards. See Id. ¶¶ 15-16.

The Ninth Circuit has expressly rejected Payless' assertion that adidas' trademark claims violate the design standards implicit in the 1994 Settlement Agreement. Under Oregon law, the interpretation of an unambiguous contract is a question of law for the court. Rolfe v. N.W. Cattle & Re., Inc., 491 P.2d 195, 200 (Or. 1971) ("[I]f the provisions of a contract are clear and unambiguous it is the function of the court to interpret the contract and declare its legal effect . . . ."). Here, the Ninth Circuit concluded that the parties' 1994 Settlement Agreement was unambiguous, and as a matter of law, the agreement did not preclude adidas from asserting Lanham Act claims based on Payless' sale of two- or four-stripe shoes with straight edges:

> A plain reading of the agreement demonstrates that [a]didas released only those
> claims against Payless that [a]didas "brought or could have brought" before the
> dismissal of the action that was the subject of the settlement. The shoe stripe
> designs at issue in the present dispute, however, were not produced by Payless

PAGE 79 - REDACTED OPINION AND ORDER

> until after the 1994 agreement was concluded. [a]didas could not have brought a
> claim against shoes not in existence prior to the execution of the settlement. . . .
> Therefore, the 1994 settlement agreement does not preclude [a]didas' present
> Lanham Act claims against Payless.

adidas v. Payless, 166 Fed. Appx. at 271 (citation omitted; emphasis added).  To the extent that

Payless' First Counterclaim and its Third and Eleventh Affirmative Defenses are premised on the

notion that adidas' claims are precluded by the "design standards" provisions of the 1994

Settlement Agreement, adidas is entitled to summary judgment.

          b. Contractual Estoppel

As an alternative basis for its Third and Eleventh Affirmative Defenses and its First

Counterclaim, Payless argues adidas violated paragraph 4 of the 1994 Settlement Agreement.

Payless Answer, at ¶ 17.  That provision provides: "Adidas agrees that the Payless obligations

set forth in Paragraphs 1, 2, and 3 shall remain in effect so long as Adidas diligently and

aggressively acts enforce similar restrictions against other retailers in the United States." Payless

Answer, at ¶ 10; Feldman Decl., Ex. C (Agreement ¶ 4)   The "restrictions" referenced in that

prohibition are the prohibitions on the sale of athletic shoes bearing "three substantially straight

parallel stripes" or "two or four parallel double-serrated stripes of contrasting color."  Feldman

Decl., Ex. C (Agreement ¶¶ 2-3).

Here, Payless has failed to identify a single instance in which adidas failed to object to a

third-party's sale of athletic shoes bearing three substantially straight parallel stripes, or two or

four parallel double-serrated stripes.  Moreover, Payless does not dispute adidas' contention that

it has enforced its Three-Stripe Mark against dozens of third parties selling shoes with serrated-

and straight-edge stripes.  Thus, adidas is entitled to summary judgment on Payless' First

PAGE 80 - REDACTED OPINION AND ORDER

Counterclaim and its Third and Eleventh Affirmative Defenses.[19]

### 8. Stripe Depletion/Aesthetic Functionality

adidas moves for summary judgment on Payless' Fourteenth Affirmative Defense, which asserts that adidas "cannot be allowed to deplete a common, generic design feature by claiming the exclusive use of stripes on apparel, shoes, and sports equipment."  Def.'s Answer, at 10. Though the defense bears no mention of the concept of functionality, Payless now argues that the use of stripes on shoes is "aesthetically functional."  Payless contends adidas' attempt to control two- and four-parallel stripe designs on shoes "would put competitors at a significant non-reputation-related disadvantage" by "limit[ing] the range of adequate stripe designs" available for use on footwear.  See Payless Opp. at 45-48.  Assuming, arguendo, that Payless did not waive an "aesthetic functionality" defense, I find the doctrine inapplicable here.

"Under the doctrine of 'aesthetic functionality,' many visually attractive and aesthetically pleasing designs are categorized as 'functional' and hence free for all to copy and imitate." McCarthy § 7:79.  In the Ninth Circuit, however, the doctrine has been limited, if not rejected, in favor of the "utilitarian functionality" test discussed infra.  First Brands, 809 F.2d at 1382 n.3; see also Clicks Billiards, Inc. v. Sixshooters Inc., 251 F.3d 1252, 1260 (9th Cir. 2001) (Aesthetic functionality is "internally inconsistent and at odds with the commonly accepted view that

---

[19]Even if adidas had not complied with paragraph 4 of the Agreement, it would not give rise to a contractual estoppel defense or allow Payless to sell athletic shoes bearing potentially infringing two- or four straight-edge stripes.  By the agreement's express terms, the only effect of adidas' failure to enforce those restrictions would be that the contractual provision prohibiting Payless' from selling shoes with "three substantially straight parallel stripes" or "two or four parallel double-serrated stripes of contrasting color" would no longer "remain in effect."  See Feldman Decl. Ex. C (Agreement ¶ 4).

functionality denotes utility."); Vuitton Et Fils S.A. v. J. Young Enterprises, Inc., 644 F.2d 769, 773 (9th Cir. 1981) (rejecting the notion that "any feature of a product which contributes to the consumer appeal and saleability of the product is, as a matter of law, a functional element of the product."); Gucci Timepieces Am., Inc. v. Yidah Watch Co., 47 U.S.P.Q. 2d 1938, 1941 C.D. Cal. 1998) ("[T]he aesthetic functionality test is essentially defunct in this circuit."); see also McCarthy § 7:81 ("'Aesthetic functionality' is an oxymoron.  Ornamental aesthetic designs are the antithesis of utilitarian designs.").

To the extent that the aesthetic functionality defense still survives, it has been "limited to product features that serve an aesthetic purpose wholly independent of any source-identifying function." Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc., 457 F.3d 1062, 1073 (9th Cir. 2006) (emphasis added).  Thus, the aesthetic functionality defense is inapplicable where, as here, adidas seeks to prevent Payless from using a confusingly similar imitation of a trademark that is a distinctive indicator of source.  See Int'l Order of Job's Daughters v. Lindeburg & Co., 633 F.2d 912, 919 (9th Cir. 1980) (aesthetic functionality does not apply where there is a likelihood of confusion as to the source of the goods) (citation omitted); Vuitton, 644 F.2d at 776 (rejecting the claim that Louis Vuitton trademarked purse was functional where the mark had acquired secondary meaning); Dr. Ing H.C.F. Porche AG v. Universal Brass, 1995 WL 420816, at *4 (W.D. Wash 1995) ("[T]he aesthetic appeal of the mark cannot be allowed to overtake the primary function of the mark as a designation of origin or sponsorship.").  Thus, adidas is entitled to summary judgment as to Payless' aesthetic functionality defense.

### 9. Protectability of adidas' Superstar Trade Dress

As noted, adidas claims protected rights in a Superstar Trade Dress, which consists of:

(1) three parallel stripes (*i.e.*, the Three-Stripe Mark) on the side of the shoe parallel to equidistant small holes; (2) a rubber "shell toe"; (3) a particularly flat sole; and (4) a colored portion on the outer back heel that identifies the shoes as adidas' brand. Amended Complaint ¶ 22. Payless' Fifth and Sixth Affirmative Defenses allege that adidas has no valid trade dress in the Superstar product design because it lacks distinctiveness and is functional.[20]

### a. Functionality

"Trade dress protection extends only to design features that are nonfunctional." Clicks Billiards, 251 F.3d at 1258. "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobbson Products. Co., Inc., 514 U.S. 159, 164 (1995).

In general terms, "[a] product feature is functional and cannot serve as a trademark if the product feature is essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." Id. at 165. In the Ninth Circuit, courts consider four factors in determining whether a claimed trade dress is functional: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." Clicks Billiards, 251 F.3d at

---

[20]These affirmative defenses reference several other adidas shoe styles, for which adidas does not claim any trade dress rights. As such, the court's discussion is limited to the Superstar Trade Dress.

1260 (citing Disc Golf Ass'n, Inc. v. Champion Discs, Inc., 158 F.3d 1002, 1006 (9th Cir. 1998)).

"[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that [the court] focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create." Clicks Billiards, 251 F.3d at 1259; see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc., 826 F.2d 837, 842 (9th Cir. 1987) ("We examine trade dress as a whole to determine its functionality."). "[T]hat individual elements of the trade tress may be functional does not necessarily mean the trade dress as a whole is functional." adidas v. Target, 228 F. Supp. 2d at 1195. Rather, "functional elements that are separately unprotectable can be protected together as part of a trade dress." Fuddruckers, 826 F.2d at 842. In other words, the question here is not whether the individual elements of adidas' claimed Superstar Trade Dress are functional, but whether all of the elements of the Superstar Trade Dress taken together are functional. Id. at 842; see also adidas v. Target, 228 F. Supp. 2d at 1203 ("All the elements of adidas' alleged trade dress must stand or fall together.").

Though adidas acknowledges that some of the individual elements of the Superstar Trade Dress may have been intended to be functional in 1969 (when adidas introduced the shoes), Payless proffers no evidence that any of the Superstar Trade Dress elements have been functional during any part of the relevant period of alleged infringement (i.e., 2001 to the present, when all of the shoes at issue were manufactured or sold). Contrary to Payless' argument, there is authority for the proposition that product features once deemed wholly functional can be transformed over time to non-functional, source-indicating features. See adidas v. Target, 228 F. Supp. 2d at 1205 ("functionality is a fact-specific status that may change

over time. 'Even though a configuration has been held functional, its status may later change to become non-functional.'" (quoting McCarthy § 7:63)); see also In re Zippo Mfg. Co., 50 U.S.P.Q. 2d 1852, 1999 WL 398181, at *4-5 (TTAB, Mar. 23, 1999) (reversing denial of registration for a lighter, and noting changed circumstances since a previous denial of registration on the basis of functioanlity); In re Honeywell, Inc., 1988 WL 252417, *6 (TTAB, Aug. 16, 1988). In a case factually identical to this one, the court concluded:

> adidas has proffered evidence that the flat sole of the Original Superstar was considered optimal for a performance basketball shoe in 1969, when adidas introduced the Original Superstar, but that it is considered optimal no longer. adidas has also introduced evidence that the rubber toe of the Original Superstar shoe adds neither durability nor performance to the shoes, but is purely ornamental and actually increases the production cost, Judge Stewart concluded from this evidence that adidas had established the nonfunctionality of the Original Superstar trade dress. I agree with that conclusion.

adidas v. Target, 228 F. Supp. 2d at 1194-95 (J. Redden).

As adidas points out, the issue before the court is not whether the Superstar Trade Dress was designed to be functional in 1969. Rather, the issue is whether the Superstar Trade Dress was functional at the time Payless allegedly infringed adidas' rights (*i.e.*, between 2001 and the present). Other than its unsupported assertions, Payless has failed to proffer any evidence that the elements of the Superstar Trade Dress—individually or collectively—are "essential" to the use or purpose of the shoes, or "affects" their cost or quality. In fact, Payless' own witnesses have conceded that neither the stripes, the stylized "shell toe," nor the heel patch of the Superstar Trade Dress are functional. Austin Dep., at 121:6-10 (no function to Payless stripes; they are "just for look"); Waugh Dep., at 114:25-115:18 (stripe designs relate to "aesthetics" not "functionality"); Nutt Dep., at 194:17-33 ("Q:Athletic shoes today don't have rubber toe caps to

serve a functional purpose, do they? A: No, that what I just said, in 2007 the Superstar whilst I can say has some functional elements, they relate more to the elements in the '60s than today. Today it is just a fashion statement."); Austin Dep., at 121:11-17 (conceding heel patch serves no function on shoe).  adidas has also submitted evidence, which Payless does not rebut, that indicates the flat heel on the Superstar decreases performance by modern footwear standards, and that the stripes and colored heel patch increase the cost of manufacturing the shoes.  Jury Decl. ¶¶ 9, 11, 16.  Though the rubberized toe of the Superstar might make the shoe more durable, there is no evidence that the stylized "shell toe" serves any utilitarian purpose.  In any event, Payless submits no evidence that the combination of unique and stylized Superstar Trade Dress elements, taken as a whole, serve any utilitarian purpose.

In light of adidas' uncontroverted  evidence, Payless' expert witness testimony, and the court's rulings in factually identical circumstances, I conclude that there are no genuine issues of material fact as to whether the elements of the Superstar Trade Dress—collectively or individually—have been functional during any part of the relevant period of alleged infringement (*i.e.*, 2001 to the present).   Accordingly, adidas is entitled to summary judgment on the issue of functionality (Sixth Affirmative Defense).

### b. Distinctiveness

Nothing in the Lanham Act explicitly requires a producer to show that its trade dress is distinctive, but "'courts have universally imposed that requirement, since without distinctiveness the trade dress would not cause confusion . . . as to the origin, sponsorship, or approval of [the] goods' . . . ."  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210 (2000) (citation omitted; alteration in original).  As here, where a plaintiff infringement of unregistered trade

dress under Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." Id. at 216. The trade dress of a product has secondary meaning when "in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself." Id. at 211; see also Fuddruckers, 826 F.2d at 843 ("The trade dress of a product or service attains secondary meaning when the purchasing public associates the dress with a particular source."). Secondary meaning is a question of fact. First Brands, 809 F.2d at 1383.

Although adidas has presented significant circumstantial evidence of sales, advertising, product placement, and unsolicited media attention given the Superstar Trade Dress, there are genuine issues of material fact as to whether the Superstar Trade Dress has acquired secondary meaning. As Payless points out, "evidence of extensive advertising or other promotional efforts [does] not necessarily indicate that prospective buyers would associate the trade dress with a particular source." First Brands, 809 F.2d at 1383. Similarly, evidence of extensive sales or product popularity is not necessarily indicative of secondary meaning. Such evidence can be attributed to "dozens of factors, only one of which may be the drawing power of the trademark." McCarthy § 15:47. Finally, Payless points out that much of adidas' evidence of secondary meaning comes from the declaration of one of adidas' own employees. See generally Pierpont Decl. Aside from the hearsay and authentication problems associated with such evidence, the Ninth Circuit has held that "evidence of secondary meaning from a partial source possesses very limited probative value . . . because '[t]rademark law is skeptical of the ability of an associate of the trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark.'" Filipino Yellow Pages, Inc. v. Asian Journal Pubs., Inc., 198 F.3d 1143, 1152

(9th Cir. 1999).  The resolution of the issue of secondary meaning will involve factual determinations based of the credibility and the weight of the evidence.  As such, summary judgment is not appropriate at this stage of the proceedings.  The court's decision in <u>adidas v. Target</u>, 228 F. Supp. 2d 1192 (D. Or. 2002), does not dictate otherwise.  There, the court denied <u>defendant's</u> motion for summary judgment on the issue of distinctiveness, concluding that there were issues of facts as to whether the Superstar Trade Dress had acquired secondary meaning. The same issues of fact are present here.  Accordingly, adidas motion for summary judgment as to Payless' Fifth Affirmative Defense is denied.

## E. Payless' Motion to Strike adidas' Demand for Jury Trial

The Seventh Amendment provides that "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . . ."  U.S. Const. amend. VII.  Though the Seventh Amendment preserves inviolate the right to a trial by jury of all legal claims (*e.g.*, money damages), it is clear that there is no right to a jury trial in a trademark infringement action where <u>only</u> equitable claims (*e.g.*, injunctive relief) remain.  Fed. R. Civ. P. 38(a); <u>Danjaq</u>, 263 F.3d at 962.  Where both legal and equitable issues are presented in a single case, however, "only under the most imperative circumstances . . . can the right to a jury trial of legal issues be lost through prior determination of equitable claims."  <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500, 510-11 (1959).  The right to a jury trial "must not be infringed either by trying the legal issues as incidental to the equitable ones or by a court trial of a common issue existing between the claims."  <u>Danjaq</u>, 263 F.3d at 962 (quoting <u>Ross v. Bernhard</u>, 396 U.S. 531, 537-38 (1970)).  In other words, any legal claim—that is, any claim for monetary damages—entitles a party to a jury trial.

PAGE 88 - REDACTED OPINION AND ORDER

Payless argues adidas has no legal claims for relief because: (1) adidas has no evidence that Payless' alleged infringement caused any actual injury; (2) adidas cannot demonstrate Payless caused any actual dilution or that Payless willfully intended to trade on adidas' reputation, both of which are required to obtain dilution damages; and (3) adidas' remaining claims for relief—injunction and an accounting of Payless' profits—are purely equitable.  As such, Payless argues adidas is not entitled to a jury trial.  I disagree.

Contrary to Payless' contention, adidas has presented sufficient evidence to raise genuine issues of material fact as to its actual damages for both dilution and trademark infringement.  As discussed <u>supra</u> Section III.D.2, adidas has submitted evidence sufficient to allow a fact-finder to reasonably conclude that Payless both willfully intended to trade on adidas' reputation, and actually diluted adidas' Three-Stripe Mark.  Further, adidas has submitted credible evidence in the form of consumer surveys and expert opinion, which indicates that Payless' alleged infringement has caused actual injury.  <u>See</u> <u>Southland Sod Farms v. Stover Seed Co.</u>, 108 F.3d 1134, 1146 (9th Cir. 1997) (finding expert opinion report and consumer surveys to be "adequate evidence for a reasonable jury to conclude that Plaintiffs suffered actual injury . . ."); <u>see</u> <u>also</u> <u>Brunswick Corp. v. Sprint Reel Co.</u>, 832 F.2d 513, 525 (10th Cir. 1987) (actual consumer confusion entitling a plaintiff to monetary damages may be demonstrated through consumer surveys).  In sum, adidas has submitted sufficient evidence to raise genuine issues of material fact as to damages for both actual dilution and trademark infringement.  As such, adidas is entitled to a jury trial as to those legal claims.

In any event, the Supreme Court has held that a claim for an accounting of profits in a trademark infringement action is a legal claim for relief, and thus gives rise to a right to a trial by

PAGE 89 - REDACTED OPINION AND ORDER

jury.  Dairy Queen v. Wood, 369 U.S. 469, 477-78 (1962).  In Dairy Queen, the plaintiff alleged

breach of a trademark licensing agreement and trademark infringement, and sought an injunction

and an accounting of profits.  Id. at 475.  The Court held that plaintiff's claim for monetary relief

in the form of an accounting of profits was "unquestionably legal" under either basis of liability:

> [a]s an action on a debt allegedly due under a contract, it would be difficult to
> conceive of an action of a more traditionally legal character. And as an action for
> damages based upon a charge of trademark infringement, it would be no less
> subject to cognizance by a court of law.

Id. at 477-78 (footnotes omitted).  After Dairy Queen, it is clear that a claim for an accounting of

profits is treated as the equivalent of a claim for damages for jury trial purposes.  McCarthy §

32:124; see also Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp., 562 F.2d 1157,

1174-75 (9th Cir. 1977) (holding that plaintiffs had a right to a trial by jury of its claim for an

accounting of profits in an infringement action).  Though a minority of courts have limited Dairy

Queen to claims involving breach of contract, see McCarthy § 32:124 (citing cases), that

interpretation is inconsistent with the plain language of Dairy Queen, which called plaintiff's

claim "wholly legal," whether construed as a complaint for breach of contract or trademark

infringement.  Dairy Queen, 369 U.S. at 477; Lee Pharmaceuticals v. Mishler, 526 F.2d 1115,

1116-17 (2d Cir. 1975).  Accordingly, adidas' is entitled to a jury trial on its request for an

accounting of profits.  Payless' motion to strike adidas' demand for a jury trial is denied.

## IV. Conclusion

For the reasons stated above, adidas' Motion for Partial Summary Judgment (doc. 539) is

GRANTED in part, and DENIED in part; Payless' Motion to Strike adidas' Demand for Jury

Trial (doc. 545) is DENIED; Payless' Motion for Summary Judgment on adidas' Claims of

PAGE 90 - REDACTED OPINION AND ORDER

Willfulness (doc. 547) is DENIED; Payless' Motion for Summary Judgment on adidas' Federal

and State Dilution Claims (doc. 548) is GRANTED in part, and DENIED in part; Payless'

Motion for Summary Judgment on adidas' Trademark and Trade Dress Infringement Claims

(doc. 550) is DENIED; and Payless' Motion for Summary Judgment on the Affirmative Defense

of Laches (doc. 551) is DENIED; and Payless' Motion (doc. 651) to Strike Dr. Gerald Ford's

Rule 26 Reports is DENIED.

IT IS SO ORDERED.

DATED this _22nd_ day of February, 2008.


_/s/ Garr M. King_____

Garr M. King

United States District Judge