UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

ADIDAS AMERICA, INC. and ADIDAS-
SOLOMON AG,

                     Plaintiffs,

        v.

PAYLESS SHOESOURCE, INC.,

                     Defendant.

_____

CV 01-1655-KI

OPINION AND ORDER

KING, Judge:

        Following a three-week trial, a jury returned a verdict in favor of plaintiffs adidas-

America, Inc. and adidas-Salomon AG (collectively, "adidas") on its claims against Payless

Shoesource, Inc. ("Payless") for trademark and trade dress[1] infringement, dilution, and related

_____

        [1] For the sake of brevity, at times I will refer to the trademark and trade dress together as
"marks."

Page 1 - OPINION AND ORDER

federal and state law claims based on Payless' sale of footwear bearing two or four stripes.  In

addition, the jury found that Payless acted willfully and maliciously, or in wanton and reckless

disregard of adidas' trademark and trade dress rights.  The jury determined adidas was entitled to:

(1) actual damages in the form of a 7.78 percent royalty, totaling $30.6 million; (2) a $137

million accounting of Payless' profits; and (3) punitive damages of $137 million.[2]

Before the court are: (1) Payless' Motion for Judgment as a Matter of Law on adidas'

Damage Claims or, in the Alternative, for New Trial or Remittitur (#863); (2) Payless' Motion

for Judgment as a Matter of Law or a New Trial (I) Due to Plaintiff's Failure to Prove the Fact of

Actual Damage, and (ii) on the Issue of Willfulness (#866); (3) Payless' Motion for Judgment as

a Matter of Law on adidas' Liability Claims or in the Alternative, for New Trial (#868); and (4)

Payless' Supplemental Motion for New Trial (#901).  For the following reasons, I deny each of

the motions for judgment as a matter of law and/or new trial, conditioned on adidas' acceptance

of a remittitur of the punitive damages, and I reduce the award of Payless' profits.

## LEGAL STANDARDS

I.    <u>Rule 50(b)–Judgment as a Matter of Law</u>

Under Federal Rule of Civil Procedure 50(b), the court may set aside the jury's verdict in

favor of adidas, and enter judgment as a matter of law in favor of Payless, if there is "no legally

sufficient evidentiary basis for a reasonable jury to find" for adidas on an issue or claim.

"Judgment as a matter of law is proper if the evidence, construed in the light most favorable to

---

[2]  The exact figures are $30,610,179 for a reasonable royalty, $137,003,578 in Payless'
profits, and $137,003,578 in punitive damages.

the non-moving party, allows only one reasonable conclusion and that conclusion is contrary to that reached by the jury." Mockler v. Multnomah County, 140 F.3d 808, 815 n.8 (9th Cir. 1998).

A motion for judgment as a matter of law must be denied, and the jury's verdict must be upheld, if the verdict is supported by substantial evidence. Johnson v. Paradise Valley Unified School Dist., 251 F.3d 1222, 1227 (9th Cir.), cert. denied, 534 U.S. 1055 (2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." Id. When evaluating a motion for judgment as a matter of law under Rule 50, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000); see also Johnson, 251 F.3d at 1227 ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

II.    Rule 59–New Trial

Even if the verdict is supported by substantial evidence, the court may grant a motion for a new trial under Federal Rule of Civil Procedure 59 "if the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or to prevent a miscarriage of justice." Silver Sage Partners v. City of Desert Hot Springs, 251 F.3d 814, 819 (9th Cir. 2001); see also Molski v. M.J. Cable, Inc., 481 F.3d 724, 729 (9th Cir. 2007) ("Historically recognized grounds [for a new trial under Rule 59] include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party.") (internal quotation and citation omitted).  A new trial is warranted

on the basis of an incorrect evidentiary ruling only "if the ruling substantially prejudiced a party." United States v. 99.66 Acres of Land, 970 F.2d 651, 658 (9th Cir. 1992).

When a motion for new trial is based on insufficiency of evidence, a "stringent standard applies" and a new trial may be granted "only if the verdict is against the great weight of evidence or it is quite clear that the jury has reached a seriously erroneous result." Digidyne Corp. v. Data Gen. Corp., 734 F.2d 1336, 1347 (9th Cir. 1984) (internal quotation and citation omitted), cert. denied, 473 U.S. 908 (1985). The "district court may not grant a new trial simply because it would have arrived at a different verdict." Silver Sage Partners, 251 F.3d at 819. Rather, the "trial court must have a firm conviction that the jury has made a mistake." Landes Constr. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1372 (9th Cir. 1987). When evaluating a motion for new trial under Rule 59, the court may weigh the evidence, evaluate the credibility of the witnesses, and is not required to view the evidence from the perspective most favorable to the prevailing party. United States v. Kellington, 217 F.3d 1084, 1095 (9th Cir. 2000).

III.    Remittitur

Remittitur is available to correct excessive verdicts. Pershing Park Villas v. United Pacific Ins., 219 F.3d 895, 905 (9th Cir. 2000). Generally, a court "must uphold the jury's finding of the amount of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." Los Angeles Mem'l Coliseum Comm'n v. NFL, 791 F.2d 1356, 1360 (9th Cir. 1986), cert. denied, 484 U.S. 826 (1987). A trial court reviewing a damages award attacked as excessive must consider the evidence of damages in a light most favorable to the prevailing party. Seymour v. Summa Vista

Cinema, Inc., 809 F.2d 1385, 1387 (9th Cir.), opinion amended on other grounds, 817 F.2d 609

(9th Cir. 1987).  If the court concludes that a damages award is excessive, it may either grant the

defendant's motion for a new trial, or deny the motion, conditioned upon the prevailing party's

acceptance of a remittitur.  Silver Sage Partners, 251 F.3d at 818.  A trial court granting a motion

for remittitur does not substitute its judgment for that of the jury, but instead reduces the

judgment to the maximum amount sustainable by the proof.  D & A Redi-Mix v. Sierra

Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir. 1982).

## DISCUSSION

I.    Juror Misconduct

At the outset, Payless moves for new trial based on alleged juror misconduct.

Approximately three weeks after the jury returned its verdict, the court received a letter from

Juror X requesting clarification of the "definition of the trial being over," because she

"understood from [the court's] instructions that we weren't to actively engage on the Internet . . .

in regard to the case until the trial was over."  Tr. of May 27, 2008 Tel. Conf. at 4:6-13 (quoting

letter).  Juror X wanted to know, "[w]as that on Thursday, when everyone rested, or was it on

Monday, after the verdict was read and we were excused as jurors?"  Id. at 4:13-15.

On May 27, 2008, the court held a telephone conference to read Juror X's letter to the

parties.  During the telephone conference, Payless' counsel revealed that Juror X had contacted

him by email on May 20, 2008 to ask if Payless was appealing the verdict.  Payless' counsel

indicated that he also spoke with Juror X by phone for about twenty minutes.  He answered some

very general questions Juror X had about the appeal.  Payless' counsel asked if any outside

Page 5 - OPINION AND ORDER

influences or extraneous information found its way into the deliberations. Juror X was quite

certain everybody followed the rules.

On May 28, 2008, the court held an evidentiary hearing with Juror X. She explained that

she wrote to the court because she was concerned that another juror may have violated the court's

instructions regarding out-of-court investigation:

> JUROR X: There was a conversation on Friday morning, when all the jurors were together. When we went in and we had all the instructions, I started to read through, and other conversations were going on.
>
> One juror said something–and, again, I can't recall verbatim, because I was overhearing. What I overheard was something about going online last night or the night before, and–and then there was something else said, but it wasn't necessarily about adidas or Payless. It was about appeals.
>
> . . . .
>
> . . . The comment was made, "Well, the verdict will be appealed anyway."
>
> And then there was–the juror said something about a Ninth–I don't know if it was District or Circuit or something about court.
>
> There was another juror, I think, who asked something about "Well, are there a lot of verdicts overturned?"
>
> At that point, I don't think I caught everything, because my brain went to "What did the judge say?" or "Does this matter? Does it mean anything?"
>
> . . . .
>
> Then based on that, I was kind of testing the waters, and I said, "Oh, well, I thought we couldn't do anything until after we were all gone. If I had known we could have gone online last night, I would have gone online last night."
>
> And nobody responded.

Tr. of May 28, 2008 Hr'g at 5:6-6:12.

Page 6 - OPINION AND ORDER

In a response to the court's questions, Juror X stated:

And then another juror asked and said, "Are–are a lot of verdicts overturned?"

And the other juror said, "Not that many," and then kind of talked a little bit about–I can't remember verbatim, but just a little about the process or where it goes, like to the Supreme Court or something.

. . . .

THE COURT:  Do you remember anything being said by this juror who went online or any of the other jurors about getting information from the outside and relaying it to the other jurors?  The person that went online, did they say anything that had anything to do with the facts of this case?

JUROR X:  No, no.

Id. at 8:11-9:2.

At the conclusion of the May 28 evidentiary hearing, Juror X identified Juror Y as the

juror who spoke about going online.

On June 4, 2008, the court interviewed Juror Y:[3]

THE COURT:  And tell me, did you do any looking up of material on the Internet and then discuss it with the jury?

JUROR Y:  No, didn't.  Did discuss things, prior knowledge, you know, years before, from just searching the Internet, about appeals and jury judgments and awards.

THE COURT:  Okay. Well, why don't you tell me–okay. What you're saying, then, is you didn't look up anything specifically during this trial?

JUROR Y:  No, sir.

THE COURT:  Before or after?

---

[3]  The court did not inform Juror Y of the reason for the interview until the court began questioning him.

Page 7 - OPINION AND ORDER

JUROR Y:  No.

Tr. of June 4, 2008 Hr'g at 4:7-19.

Juror Y explained, "I remember people were talking about award judgments, awarding–that wanted large amounts.  They were getting real large, 7, 800 million.  And I just said, from looking up, from what I've seen before, if you get a real excessive amount, you're just going to be shoved out." Id. at 5:8-13.

Juror Y repeatedly denied doing any research on the internet during the trial or during the deliberations.  He remembers the entire conversation in the jury room taking a minute or less.

Payless contends that the testimony of Jurors X and Y establish that the jury was exposed to extrinsic evidence obtained from the Internet during deliberations.  Payless argues that there is a "reasonable possibility" that this extrinsic evidence affected the verdict and therefore, Payless is entitled to a new trial under Federal Rule of Civil Procedure 59.  I disagree.

A.    Legal Standards Governing Juror Misconduct

There are two types of juror-misconduct cases.  United States v. Rosenthal, 454 F.3d 943, 949 (9th Cir. 2006) (citing Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Serv. Co., 206 F.3d 900, 906 (9th Cir.), cert. denied, 531 U.S. 919 (2000)).  The first type is extraneous[4] evidence cases which "involve not only the introduction of 'evidence' per se but the submission of extraneous information (e.g., a file or dictionary) to the jury." Id. (internal quotation omitted).  The party seeking a new trial must show by a preponderance of evidence that the jury was exposed to extrinsic evidence.  United States v. Caro-Quinero, 769 F. Supp. 1564, 1574 (C.D. Cal. 1991), aff'd, 42 F.3d 1403 (1994).  In an extraneous evidence case, the court grants a new trial "if there

---

[4]  Also known as extrinsic evidence.

is a reasonable possibility that the material could have affected the verdict." Rosenthal, 454 F.3d at 949 (internal quotation omitted). The party opposing a new trial has the burden to demonstrate the absence of prejudice. Id.

The second type of case involves ex parte contacts with a juror that "do not include the imparting of any information that might bear on the case." Id. (internal quotation omitted). Ex parte contacts "do not pertain to any fact in controversy or any law applicable to the case." Id. (internal quotation omitted). In an ex parte contacts case, the court must hold a fair hearing if it finds a reasonable possibility of prejudice. Unless the ex parte contact is inherently coercive, the movant is not entitled to a new trial without demonstrating actual prejudice. Id.

B.    Analysis

The initial issue is whether the information from Juror Y is extraneous evidence or an ex parte contact. Information about appeals arguably pertains to the law applicable to the case. It is similar to the extraneous evidence in Rosenthal, in which a juror asked an attorney friend if she had to follow the judge's instructions. Neither of these juror discussions directly concerned the substantive law in the case, but did concern procedural matters. Id. at 950. Thus, I will use the reasonable possibility standard and adidas must demonstrate the absence of prejudice. First, Payless must prove that the jury was exposed to extrinsic evidence.

        I conclude that Payless has not met its burden of proving by a preponderance of evidence that Juror Y improperly exposed the jury to extrinsic evidence obtained from the Internet during deliberations. Juror Y unequivocally and repeatedly denied engaging in any outside research during the trial. He stated that his comments regarding appeals and reversal of excessive verdicts were based on his general knowledge and prior searches on the Internet. In contrast, Juror X was

unable to definitively state what she overheard Juror Y say in the jury room.  Juror X's vague recollections of what she thought she overheard Juror Y say about searching the Internet more than three weeks after the jury returned its verdict are not sufficient to establish by a preponderance of evidence that Juror Y did, in fact, violate the court's instructions or introduce extrinsic evidence obtained from the Internet during deliberations.

Moreover, Juror Y's comments regarding the likelihood of appeal and cautioning against an excessive verdict simply do not constitute the type of extrinsic information the Federal Rules of Evidence seek to prohibit.  In examining a claim of a juror misconduct, a court must determine whether the allegedly extrinsic materials are, in fact, improper extrinsic materials, or are "merely the kind of common knowledge, which most jurors are presumed to possess."  Fields v. Brown, 503 F.3d 755, 779 (9th Cir. 2007) (citation omitted), cert. denied, 128 S. Ct. 1875 (2008); see also  Hard v. Burlington Northern Railroad Co., 870 F.2d 1454, 1461 (9th Cir. 1989) ("The type of after-acquired information that potentially taints a jury verdict should be carefully distinguished from the general knowledge, opinions, feelings, and bias that every jury carries into the jury room."); Gotemeyer v. Hickman, 393 F.3d 871, 878-79 (9th Cir. 2004) (distinguishing between extrinsic evidence and "a juror sharing her own experiences [as a physician] with her colleagues on the jury"), cert. denied, 546 U.S. 880 (2005).  Indeed, "[j]urors must rely on their past personal experiences when hearing a trial and deliberating on a verdict." Price v. Kramer, 200 F.3d 1237, 1255 (9th Cir.), cert. denied, 531 U.S. 816 (2000).

Here, Juror Y's statements regarding the likelihood of appeal and reversal of excessive damages awards are exactly the kind of general knowledge, opinion, and belief that jurors are allowed to possess and bring to the table during jury deliberations.  The general population is

aware that cases can be appealed and that excessive verdicts are sometimes overturned.  Payless

was entitled to an "impartial jury, not an ignorant one," Grotemeyer, 393 F.3d at 879, and Juror

Y's comments regarding the likelihood of appeal and/or reversal of an excessive verdict "merely

confirmed what any reasonable juror already knew."  United States v. Bagnariol, 665 F.2d 877,

888 (9th Cir. 1981), cert. denied, 456 U.S. 962 (1982).  As adidas points out, it would be

virtually impossible to seat a jury with citizens who have absolutely no knowledge of the appeals

process.  Juror Y's general comments about potential for appeal do not fall within the realm of

impermissible extraneous evidence that Rule 606 was intended to remedy.

Even if I were persuaded that Juror Y's statements were impermissible extrinsic

information (which I am not), there is no reasonable possibility that Juror Y's general statements

about the likelihood of appeal and the reversal of excessive verdicts could have affected the jury

verdict.  The Ninth Circuit instructs the trial court to consider the following factors in

determining whether there is a reasonable possibility that extrinsic evidence affected the verdict:

(1) whether the material was actually received, and if so, how; (2) the length of time it was

available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the

material was introduced before a verdict was reached, and if so at what point in the deliberations;

and (5) any other matters which may bear on the issue of the reasonable possibility of whether

the extrinsic material affected the verdict.  Estrada v. Scribner, 512 F.3d 1227, 1238 (9th Cir.),

cert. denied, 128 S. Ct. 2973 (2008).  Generally, a court will not order a new trial unless the juror

misconduct "relates directly to a material aspect of the case," and there is a "direct and rational

connection" between the extrinsic information and the verdict.  Bagnariol, 665 F.2d at 1575.

Applying these factors here, there is no reasonable possibility that Juror Y's general statements about the likelihood of appeal and the reversal of excessive verdicts could have affected the jury verdict. The testimony of Juror Y and Juror X indicate that only a few members of the jury heard the comments. Any discussion that followed took less than one minute. Further, both Jurors Y and X indicated that Juror Y made the comments at the very beginning of the jury's two-day deliberation. There is no indication that anyone discussed the issue again. Finally, the possibility of appeal was peripheral to the issues that were before the jury and did not directly relate to any material fact or substantive law applicable to the case. These factors indicate that there is no reasonable possibility of prejudice. adidas met its burden that Payless suffered no prejudice. Accordingly, Payless' motion for new trial based on juror misconduct is denied.

II.    Likelihood of Confusion

Payless argues that the evidence presented by adidas to establish a likelihood of confusion was insufficient to support the jury's verdict for five reasons: (1) the court erred in admitting Dr. Ford's likelihood of confusion analysis because Dr. Ford did not survey all of the accused shoes, and his analysis was based, in part, on the evaluation of third-party shoes; (2) adidas failed to introduce any evidence as to 107 of the 268 accused shoe lots which were not included in Dr. Ford's analysis so it would be improper for the jury to extrapolate evidence about the surveyed shoes to the shoes not included in the survey; (3) no reasonable jury could find actionable similarity between the so-called "Category A" lots and adidas Three-Stripe Mark or the Superstar Trade Dress because the shoes bear little, if any, resemblance to any specific adidas shoe; (4) adidas presented no evidence that the alleged post-sale confusion of consumers actually

affected a later purchasing decision; and (5) adidas failed to present evidence that Payless'

actions affected any purchasing decisions and thus, the evidence cannot support a finding of

initial-interest confusion.

This court has ruled three times that Dr. Ford's likelihood of confusion survey evidence

was admissible as evidence of actual confusion.  See Dec. 21, 2007 Opinion and Order, at 11, 37;

Pre-Trial Conference Tr. at 60:24-61:3; and Trial Tr. at 1695:5-12 (denying Payless' Rule 50

motion).  Payless offers no compelling rationale or authority for upsetting those rulings now.

After considering Payless' other four arguments, the court concludes that sufficient

evidence supports the jury's finding of likelihood of confusion.  Payless' arguments focus almost

exclusively on a single factor in the likelihood of confusion analysis (*i.e.*, actual confusion) and

ignore the other relevant factors.  In determining whether the accused Payless shoes were likely

to cause consumer confusion, the jury was charged with considering not just evidence of actual

confusion—that is, Dr. Ford's likelihood of confusion surveys—but with weighing: (1) the

similarity of the marks; (2) the relatedness of the parties' goods; (3) the similarity of trade or

marketing channels; (4) the strength of the plaintiff's marks; (5) defendant's intent; (6) evidence

of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the

likelihood of expansion into other markets.  AMF v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th

Cir. 1979).  Payless' arguments are not persuasive.

III.    Dilution

Payless argues that the Trademark Dilution Revision Act ("TDRA") and its predecessor,

the Federal Dilution Trademark Act, both require adidas to prove that Payless used two or four

stripes on shoes as its own trademark.  As such, Payless contends that adidas' dilution claims fail

Page 13 - OPINION AND ORDER

as a matter of law because adidas acknowledges (and this court has found) that Payless uses stripes "merely for decoration and not as a brand or trademark." adidas' Mem. in Supp. of Mot. for Partial Summ. J. (#552) at 19; Dec. 21, 2007 Opinion and Order (#662) at 62-64. I disagree.

Payless' argument that its subjective intent to use stripes as mere decoration, rather than as a trademark, controls whether its use of stripes falls within the scope of the TDRA is supported by neither the case law nor the policy underlying federal dilution law. The TDRA provides, in relevant part, that "the owner of a famous mark . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution . . . of the famous mark." 15 U.S.C. § 1125(c)(1) (emphasis added).

Dilution is "the lessening of the capacity of a famous mark to identify and distinguish goods or services of the owner of the famous mark such that the strong identification value of the owner's trademark whittles away or is gradually attenuated as a result of its use by another." Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007) (internal quotation marks omitted; emphasis added).

As adidas notes, I have rejected Payless' present argument more than once. I agree with adidas that the important issue is whether consumers perceive Payless' use of two and four stripes as a trademark so that the value of the mark to adidas is diluted. This can occur even if Payless does not put a nickel into promoting the stripes as its own trademark. Although Horphag does not address the issue directly, Payless' argument is undercut by Horphag because the court found that the famous mark was diluted by the competitor, even though the competitor did not use the famous mark as its own mark. Id. at 1033-37.

Page 14 - OPINION AND ORDER

I am unconvinced by Payless' argument and decline to change my prior rulings.

IV.    Fact of Actual Harm

At trial, adidas did not present evidence of lost sales. Instead, adidas proffered evidence that Payless' infringement damaged the distinctiveness, perceived quality, positive consumer associations, and consumer loyalty that adidas built up in its Three-Stripe Mark and Superstar Trade Dress. Payless contends that adidas' "speculative" and "hypothetical" expert opinion testimony regarding brand devaluation theory was not sufficient to prove that adidas suffered actual harm as a result of Payless' infringement. As such, Payless contends that it is entitled to judgment as a matter of law on adidas' damages claims.

adidas' loss of the ability to control its reputation for quality is a legally cognizable form of injury. Yale Electric Corp v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928). Judge Learned Hand described the loss of control over reputation as follows:

> [I]t has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use . . . .

Id. The Ninth Circuit starts with the basic premise that a "plaintiff must prove both the fact and the amount of damage." Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir.) (quoting 2 J. Thomas McCarthy, Trademarks and Unfair Competition § 30.27 at 511 (2d ed. 1984)), cert. denied, 510 U.S. 815 (1993). The Circuit puts a twist on this, however:

> Other jurisdictions have made a distinction between the elements necessary to establish a legal basis for liability from those required for proof of damages. Although we recognize this distinction, [n]evertheless, an inability to

show actual damages does not alone preclude a recovery under section 1117. In so holding, we express a distinct preference for those opinions permitting relief based on the totality of the circumstances. See Burger King Corp., 855 F.2d at 781 (plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits) . . . .

Id. at 1410-11 (internal quotation and citation omitted). In Southland Sod Farms, the Ninth Circuit elaborated on its decision in Lindy Pen:

> Moreover, although the Ninth Circuit in Harper House stated that "actual evidence of some injury resulting from the deception is an essential element" in a suit for damages under §43(a), id., a more recent decision holds that "an inability to show actual damages does not alone preclude recovery under section 1117." Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1411 (9th Cir. 1993) (quoting Bandag, Inc. v. Bolser's Tire Stores, 750 F.2d 903, 919 (Fed. Cir. 1984)). Under Lindy Pen, the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances.

Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1146 (9th Cir. 1997).

adidas relied primarily on two experts, Dr. Joachimsthaler and Dr. Pham, to provide evidence of the harm suffered by its marks. Payless first raised its current argument in motions in limine based on Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993), to prevent the experts from testifying. Now that I have heard the entire testimony of the two experts, I am no more persuaded by Payless' argument than I was prior to trial. There is no requirement that these experts quantify the harm suffered by the brand. And the fact that the brand is very strong does not mean that it was not harmed by the infringement. The jury accepted the expert testimony, as it was entitled to do. No error was committed.

V.    Willfulness

Payless argues that the jury's finding of willfulness and the resulting award of profits must be vacated because: (1) the court barred Payless from informing the jury that Magistrate

Page 16 - OPINION AND ORDER

Judge Jelderks and District Court Judge Haggerty both found that the parties' 1994 Settlement Agreement allowed Payless to continue selling shoes with two and four parallel straight-edged stripes like the ones at issue; (2) Judge Jelderks' and Judge Haggerty's rulings preclude a finding of willfulness during the three-year period when those rulings were in effect (*i.e.*, prior to the Ninth Circuit's reversal); and (3) the jury's finding of willfulness lacks support as to any of the 112 so-called "Category A" lots, which adidas did not accuse of imitating any specific shoes. Because the jury's finding of willfulness is unsupported by the record, Payless argues, the jury's award of profits and punitive damages must be vacated.

Contrary to Payless' argument, the court did not preclude Payless from eliciting testimony or introducing evidence or argument that Payless relied on the rulings of Magistrate Judge Jelderks and District Court Judge Haggerty that the 1994 Settlement Agreement insulated Payless from any liability premised solely on the use of two or four straight-edged stripes.  Although the court did preclude Payless from introducing those summary judgment opinions as exhibits, the court specifically allowed Payless to argue and introduce evidence that Payless believed, based on the 1994 Settlement Agreement and Judges Jelderks' and Haggerty's interpretations of that agreement, that it could sell shoes bearing two or four straight-edged stripes.  See Pre-Trial Conference Tr. at 47:1-48:15 (allowing evidence and argument "relevant to . . . Payless' intent, that it honestly believed that the '94 agreement allowed use of straight-edged stripes, . . . I am going to allow Payless to bring in factors . . . to determine the strength of adidas' trademark and Payless' intent.  It will come in for those general purposes.  But Payless will have to pose the issues in the proper context, with a proper foundation."); see also Trial Tr. at 883:9-12 ("Payless can argue the agreement as it affects its intent.  So I think the jury needs to know that the

Page 17 - OPINION AND ORDER

settlement agreement evidence relates solely to intent and is not a bar."). Payless fails to cite any portion of the record in which it attempted to proffer (and the court explicitly excluded) evidence of Payless' good faith reliance on the 1994 Settlement Agreement or the court's prior rulings interpreting that agreement.[5]  If Payless had made an offer of proof, any misunderstanding as to the extent of my ruling would have been corrected.  As such, Payless' motion for new trial based on purportedly erroneous evidentiary rulings is without merit.

I am unpersuaded by Payless' argument concerning the Category A shoes.  With 268 lots of shoes, adidas had to allocate its trial time and presumably spent the most time on the closest copies.  After much discussion and consideration, however, I had the jury make a separate decision on whether each lot of shoes was infringing.  The jury ruled for adidas in 267 of the 268 lots, indicating to me that the jury took its role seriously and considered each lot separately, as I instructed it to do.  The Category A shoes are no reason to disturb the jury's wilfulness decision or to grant a new trial.

As noted by adidas in its brief, the jury was presented with evidence from many sources on which it could base the willfulness determination, including internal Payless communications which refer to Payless shoes as adidas shoes.

--------

[5]In its motion, Payless cites only one specific ruling, in which the court granted in part adidas' motion in limine to exclude evidence inconsistent with the court's December 21, 2007 Opinion and Order.  That ruling did not extend to Judges Jelderks' and Haggerty's previous rulings and the court made clear that evidence related to the 1994 Settlement Agreement was admissible to the extent that it was relevant to Payless' intent.  Trial Tr. at 47:22-49:5.  Payless cites two other portions of the trial record: (1) a passage at the end of Vanessa Backman's cross-examination; and (2) a short discussion of Payless' annual reports, which contained a description of the legal proceedings.  In neither instance did Payless indicate that it wanted to elicit testimony or proffer evidence regarding Payless' intent, or its reliance on Judges Jelderks' or Haggerty's rulings.

Finally, I will consider Payless' argument concerning its right to rely on Judge Jelderks' and Judge Haggerty's rulings during the three years prior to the Ninth Circuit reversal when I consider the damages awards.

VI.    Damages

Payless argues that the jury's $305 million damages award is flawed in numerous respects. First, Payless contends that the jury's $30.6 million "reasonable royalty" calculation is contrary to law, speculative, and arbitrary. Second, Payless argues the award of profits is contrary to law because the jury did not (and could not) find willfulness by clear and convincing evidence, and the award of profits plus a reasonable royalty constitutes an impermissible double recovery. Payless also argues the award of profits violates the Lanham Act's prohibition against damages as a penalty. Finally, Payless argues that the jury's award of punitive damages for violations of state law is fundamentally inequitable, violates the Due Process Clause, and violates clearly established principles of federalism. In light of these "fundamental flaws," Payless moves to vacate the jury's verdict or, in the alternative, to remit the award of damages to no greater than $19.7 million (*i.e.*, Payless' claimed profits) or remand for a new trial on the issue of damages.

Although I have carefully considered all of the parties' arguments, and given a great deal of thought to whether the jury's damages awards should stand, I will not address each point raised by the parties in detail. Instead, I will explain the reasons why I have decided to award the jury's figure of $30,610,179 as damages in the form of a reasonable royalty and use my discretion under the Lanham Act to reduce the award based on a disgorgement of profits to

$19.7 million. I also deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

      A.      <u>Damages under the Lanham Act</u>

If trademark infringement is found under the Lanham Act, it provides recovery of the defendant's profits and any damages sustained by the plaintiff, subject to the principles of equity. 15 U.S.C. § 1117(a).

> The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

<u>Id.</u>

Thus, the Lanham Act provides the court with considerable "discretion to fashion relief, including monetary relief, based on the totality of the circumstances." <u>Southland Sod Farms</u>, 108 F.3d at 1146; <u>see also</u> <u>Lindy Pen</u>, 982 F.2d at 1411 (affirming district court's denial of an accounting of profits and award of damages).

Section 1117 does not give the court discretion to make a downward adjustment of actual damages. <u>Go Medical Industries Pty., Ltd. v. Inmed Corp.</u>, 471 F.3d 1264, 1274 (Fed. Cir. 2006). "[I]t is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." <u>Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.</u>, 692 F.2d 1272, 1275 (9th Cir. 1982).

Page 20 - OPINION AND ORDER

In this case, I had the jury assess the profits and damages according to my instructions. It is now my job to determine if the jury verdict is equitable and comports with the law.

1.    Reasonable Royalty

A reasonable royalty based on a hypothetical negotiation can be a measure of actual damages in a trademark infringement case. Sands, Taylor & Wood v. Quaker Oats Co., 34 F.3d 1340, 1350 (7th Cir. 1994) ("one measure of actual damages that, if ascertained with reasonable certainty, could be said to reflect the actual loss of [the trademark owner]–the cost of a reasonable royalty"); Playboy Enterprises, 692 F.2d at 1274-75 (concluding that the damages award based on the trademark owner's standard royalty rate was inadequate and awarding an accounting of defendant's profits).

adidas sought a reasonable royalty as a surrogate measure of damage to the marks, even though it concedes that it would not have licensed the marks to Payless. The evidence shows that the adidas marks are strong and grew stronger during the period in question. The evidence is of theoretical damage to the marks. There was no evidence of monetary loss to adidas in the nature of lost sales. The royalty figure awarded by the jury is consistent with royalties between adidas or Payless with third parties and also with royalties between third parties.

Although the jury's royalty award would have resulted in a loss to Payless at the current price point, this does not make the royalty unreasonable. "'There is no rule that a royalty be no higher than the infringer's net profit margin.'" Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed. Cir. 2004) (quoting State Indus. Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573,

1580 (Fed. Cir. 1989), cert. denied, 493 U.S. 1022 (1990)) (in patent infringement case, court notes that what the infringer might have preferred to pay is not the test for damages).

In sum, the jury accepted adidas' calculations. The royalty award is supported by substantial evidence and is not against the clear weight of the evidence. I will allow it to stand.

2.    Profits

A defendant's profits can only be disgorged to prevent unjust enrichment if the trademark infringement was willful. Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1995). Payless contends that I erred in failing to instruct the jury that it could only make a finding of willfulness under a clear and convincing standard. In a trademark case, Gracie v. Gracie, 217 F.3d 1060, 1068-69 (9th Cir. 2000), the court analyzed and approved a jury instruction on willfulness that did not refer to a clear and convincing standard. I am aware of CollegeNET, Inc. v. XAP Corp., 483 F. Supp. 2d 1058, 1065 (D. Or. 2007), and its holding that a finding of willful misconduct under the Lanham Act must be supported by clear and convincing evidence. CollegeNET cites three cases for this proposition, without any analysis. I reviewed the cited cases, however, and do not believe that they provide convincing support for a requirement of a clear and convincing standard. Accordingly, I am not persuaded that the jury instruction was in error.

adidas was very aggressive in calculating Payless' profits. I conclude that the profits, as calculated by adidas' expert, were overstated and did not follow generally accepted accounting principles. I realize that under § 1117, Payless has the burden to prove all costs and deductions claimed. But after reflecting on Payless' expert's calculations, I do not think that Payless deducted any costs which did not actually contribute to the sale of the infringing shoes. Frank

Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 516 (9th Cir. 1985) (when calculating copyright infringer's profits, overhead costs should be deducted "only when the infringer can demonstrate that [the overhead expense] was of actual assistance in the production, distribution or sale of the infringing product.") (internal quotation omitted).

As one example, a royalty would have to be deducted as a direct expense of selling the shoes. The fact that adidas did not include a royalty in its calculation demonstrates the unreasonableness of its method.

After advocating for a figure of $208 million dollars in Payless' profits, the adidas expert admitted that a commonly used measure of profit would result in a $19 million dollar profit, a figure very close to that proffered by the Payless expert. I realize that adidas subtracted less overhead than normal to calculate profits for this disgorgement exercise, but the difference in the two amounts demonstrates the unreasonableness of the jury's award when I consider the equities.

I have also given a great deal of consideration to the jury's finding of willfulness. I firmly believe that the jury's finding of willfulness is correct given the evidence before it. But I am aware that the legal opinions of Judges Jelderks and Haggerty adopted Payless' interpretation of the 1994 settlement agreement until reversal by the Ninth Circuit three years later. During those three years, Payless did not commit willful infringement, although I note that Payless did not stop selling the shoes when adidas prevailed before the Ninth Circuit. Finally, there was substantial evidence of companies other than Payless selling two and four stripe shoes for years.

After considering all these factors, I conclude that the jury's verdict of just over $137 million is so high that it is punitive rather than compensatory, and thus violates the Lanham

Act.  In my discretion under the Lanham Act, I find that an adequate recovery of defendant's profits is $19.7 million.

      B.     <u>Punitive damages</u>

The jury's verdict of $137,003,578 in punitive damages is based on adidas' common-law claims for trademark and trade dress infringement and statutory claims for unfair and deceptive trade practices under the acts of numerous states.

Payless contends that only five of the states allow punitive damages for the statutory claims under a clear and convincing standard, as instructed here with respect to the state claims, and that some of those states cap punitive damages unless special procedures are followed. Because the jury awarded punitive damages in the same amount as Payless' profits, Payless argues that the jury awarded punitive damages based on sales in all 50 states.  Thus, Payless claims the amount of punitive damages violates the Constitution's principles of federalism because the award is punishing conduct taking place outside Oregon and in states which would not award punitive damages.

adidas argues that the state common law claims support the punitive damages award because the harm is felt by adidas here, where it has its North American headquarters.

Payless bases its argument on <u>State Farm Mutual Automobile Insurance Co. v. Campbell</u>, 538 U.S. 408, 421-22, 123 S. Ct. 1513 (2003) (internal citations omitted):

> A State cannot punish a defendant for conduct that may have been lawful where it occurred.  Nor, as a general rule, does a State have a legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.  Any proper adjudication of conduct that occurred outside Utah to other persons would require their inclusion, and, to those

parties, the Utah courts, in the usual case, would need to apply the laws of their relevant jurisdiction.

I am not convinced this principle applies here. In State Farm, plaintiff's counsel introduced evidence of State Farm's business practices for over 20 years in numerous states, with most of the practices bearing no relation to the bad faith third-party automobile insurance claim underlying plaintiff's complaint against the insurer. Id. at 415. "The [Utah] courts awarded punitive damages to punish and deter conduct that bore no relation to the [plaintiffs'] harm." Id. at 422. In part because of extraterritoriality concerns, the Court reversed the jury's verdict of $145 million in punitive damages, which the trial court had reduced to $25 million. Id. at 429.

Here, the evidence concerned Payless' conduct while infringing adidas' marks. The jury was not shown evidence that Payless infringed marks owned by anyone other than adidas. Thus, the jury verdict is based on the harm that Payless inflicted on adidas. That fact distinguishes the case before me from State Farm.

Alternatively, Payless argues that the punitive damages award is grossly excessive and thus violates due process principles. adidas claims that clear and convincing evidence fully supports the award.

The Due Process Clause prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. State Farm, 538 U.S. at 416. In reviewing a punitive damages award, a court must consider three guideposts:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

Id. at 418 (citing BMW of North America, Inc. v. Gore, 517 U.S. 559, 575, 116 S. Ct. 1589

(1996)).

The degree of reprehensibility of defendant's conduct is the "most important indicium" of

the reasonableness of a punitive damages award.  The factors to be considered are whether

(1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an

indifference to or a reckless disregard of the health or safety of others; (3) the target of the

conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated

incident; and (5) the harm was the result of intentional malice, trickery, deceit, or mere accident.

Id. at 419.

Although the Court declined to establish a bright-line ratio which punitive damages

cannot exceed, it noted that the jurisprudence has established that "in practice, few awards

exceeding a single-digit ratio between punitive and compensatory damages, to a significant

degree, will satisfy due process."  Id. at 425.  "It should be presumed a plaintiff has been made

whole for his injuries by compensatory damages, so punitive damages should only be awarded if

the defendant's culpability, after having paid compensatory damages, is so reprehensible as to

warrant the imposition of further sanctions to achieve punishment or deterrence."  Id. at 419.  See

also Exxon Shipping Company v. Baker, __ U.S. __, 128 S. Ct. 2605, 2633 (2008) (under

maritime law, maximum award of punitive damages is equal to compensatory damages).

The first Gore guidepost is the degree of reprehensibility of Payless' conduct.  The harm

here is entirely economic.  Thus, Payless did not show an indifference to the health or safety of

others.  Moreover, there was no evidence that adidas lost any sales because of the infringement.

Based on my instructions, the jury awarded a reasonable royalty as a surrogate form of damages instead of trying to quantify the harm to the distinctiveness, perceived quality, positive consumer associations, and consumer loyalty that adidas had built up in its marks. There was no evidence that adidas had financial vulnerability or that it suffered financial problems because of the infringement. In fact, the evidence showed that the adidas brand strengthened during the period of infringement.

The fourth factor under the reprehensibility guidepost is whether the conduct is repeated or isolated. The jury found that 267 lots of Payless' shoes infringed the adidas marks. Thus, this factor weighs heavily in favor of a larger award.

The last factor is whether the conduct was intentional malice, trickery, deceit, or mere accident. I have dealt with this issue above when considering the jury's willfulness finding. This was no mere accident. But, again, I do note that Payless sold the infringing shoes for three years believing that Judges Jelderks' and Haggerty's opinions allowed the sales under the 1994 settlement agreement. This is balanced by the fact that Payless did not stop selling the shoes after the Ninth Circuit reversed those rulings.

The second *Gore* guidepost is the disparity between the harm suffered by adidas and the punitive damages award. The first issue is what numbers I must compare. The $30.6 million royalty figure was to compensate for harm suffered to the marks. Payless' profits, cut down by me to $19.7 million, is to prevent unjust enrichment. Although defendant's profits are part of the recovery allowed under the Lanham Act–to remove any financial incentive for infringement–they are not harm suffered by the mark owner. Thus, I conclude that I should compare the $30.6

Page 27 - OPINION AND ORDER

million royalty figure with the $137 million dollar punitive damages award. The ratio between the two is 4.5 to 1. This single-digit ratio, on its own, does not offend the Due Process Clause. But the analysis is not limited to the simple arithmetic calculation. The Court has noted that if the compensatory damages are substantial, a lesser ratio, "perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." State Farm, 538 U.S. at 425. I consider $30.6 million in compensatory damages to be substantial, particularly in light of the fact that adidas lost no sales and the damages are based on theoretical harm suffered to the adidas brand, something not easily quantified. This factor counsels reducing the punitive damages to $30.6 million, at the most.

The parties both agree that the third *Gore* guidepost, civil penalties in comparable cases, does not apply because there are no statutory penalties for trademark infringement.

After considering the *Gore* guideposts, I have decided that even a 1 to 1 ratio between compensatory and punitive damages is too high. The main reasons are that there was no physical harm or disregard for a person's health or safety, there were no lost sales, adidas suffered no economic harm that jeopardized its business in any way, and, even though Payless acted willfully, it did not do so for the entire period addressed here. I realize that going below a 1 to 1 ratio is unusual but such awards have been approved if there is only economic harm. See Motorola Credit Corp. v. Uzan, 509 F.3d 74 (2nd Cir. 2007) (following a court trial in a financial fraud case the trial court characterized as hard to imagine financial conduct more reprehensible, the appellate court affirmed the trial court's decision on remand to reduce the punitive damages to $1 billion from $2.1 billion, along with compensatory damages of $2.1 billion). After giving this much thought, I conclude that the punitive damages must be reduced to $15 million to

Page 28 - OPINION AND ORDER

comport with due process concerns. Accordingly, I deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

## CONCLUSION

Payless' Supplemental Motion for New Trial (#901); Payless' Motion for Judgment as a Matter of Law or a New Trial (I) Due to Plaintiff's Failure to Prove the Fact of Actual Damage, and (ii) on the Issue of Willfulness (#866); and Payless' Motion for Judgment as a Matter of Law on adidas' Liability Claims or in the Alternative, for New Trial (#868) are denied. Payless' Motion for Judgment as a Matter of Law on adidas' Damage Claims or, in the Alternative, for New Trial or Remittitur (#863) is granted as explained above.

adidas is awarded $30,610,179 as damages in the form of a reasonable royalty and $19.7 million in Payless' profits. I deny Payless' motion for a new trial, conditioned on adidas accepting a remittitur of the punitive damages award to $15 million.

IT IS SO ORDERED.

Dated this ____12th____ day of September, 2008.


   /s/ Garr M. King_____

Garr M. King
United States District Judge